928 P.2d 1054 (1996)
130 Wash.2d 782
CLEAN [Citizens for Leaders with Ethics and Accountability Now!], a nonprofit corporation, and Jordan Brower, individually and as a member of CLEAN, Appellants,
v.
The STATE of Washington, Respondent.
Frank RUANO and John Scannell, Appellants,
v.
The STATE of Washington, King County, and Ralph Munro, Respondents.
Nos. 63842-0, 63843-8.
Supreme Court of Washington, En Banc.
Argued May 15, 1996.
Decided December 20, 1996.
As Amended January 13, 1997.
*1056 Shawn Newman, Olympia, Stephen Eugster, Spokane, Kris Sundberg, Mercer Island, for Appellant CLEAN, Jordan Brower.
Shawn Newman, Olympia, for Appellant Frank Ruano.
John Scannell, Seattle, for Appellant John Scannell.
Norm Maleng, King County Prosecutor, Susan Slonecker, Deputy, Quentin Yerxa, Deputy, Appellant Unit, Seattle, for Respondent King County.
Christine Gregoire, Attorney General, Narda Pierce, Solicitor General, William Collins, Jeffrey Even, Assistants, Olympia, for Respondent State and Ralph Munro.
Montgomery, Purdue, Blankinship & Austin, John Blankinship, Seattle, for amicus curiae John D. Blankinship and Citizens for More Important Things.
Preston, Gates & Ellis, Paul Lawrence, Eileen Weresch-Doornink, Seattle, for amicus curiae Washington State Major League Baseball.
*1055 ALEXANDER, Justice.
We granted review of an order of the Thurston County Superior Court dismissing two separate challenges to an act of the Legislature that provides a means of financing the construction of a publicly owned major league baseball stadium in King County. One of the challenges to the measure is by Frank Ruano and John Scannell (jointly referred to as Ruano). The other is by Jordan Brower and a non-profit corporation called CLEAN, Citizens for Leaders with Ethics and Accountability Now, (jointly referred to as CLEAN). CLEAN contends that the aforementioned act violates several provisions of Washington's constitution. Specifically, it contends that the act: (1) funds a private project contrary to Wash. Const. art. VII, ง 1; (2) constitutes a gift or lending of the State's credit to a private enterprise, thereby violating Wash. Const. art. VIII, งง 5, 7; (3) invests public funds in a private enterprise in violation of Wash. Const. art. VIII, ง 7; and (4) violates Wash. Const. art. II, ง 28 as "special" as opposed to "general" legislation. CLEAN and Ruano both assert that what they claim is the act's invalid emergency clause wrongly circumvents the people's right to referendum as provided by Wash. Const. art. II, ง 1 (amend. 72). We conclude that the act survives all of these challenges and, consequently, affirm the trial court's order dismissing both lawsuits.
The Seattle Mariners, one of 28 major league baseball clubs, has been playing its home games in Seattle's domed stadium, the Kingdome, since 1977 when it first became a major league team. In recent years, the management of the Mariners has, on several occasions, expressed concern about the viability of the Kingdome as a facility for major league baseball. On these occasions, it indicated that in order for the Mariners to achieve financial stability and to become financially competitive with other major league baseball clubs, the Mariners needed a state of the art outdoor baseball facility as its home field.
In 1995, in an apparent effort to address the problem identified by the Mariners and *1057 to enhance the survival of major league baseball in the Seattle area, the Washington State Legislature adopted legislation that authorized King County to impose, subject to voter approval, a 0.1 percent addition to the sales and use taxes imposed in King County. Laws of 1995, 1st Spec. Sess., ch. 14, งง 6, 7. The money obtained from such a tax increase was to be used by the county to finance the construction of a new county owned major league baseball stadium. Following passage of that legislation, the King County Council sought approval by King County's voters of an increase in the sales and use taxes imposed in King County. By a narrow margin, the proposed tax increase was rejected.
Following defeat of the proposed tax increase, John Ellis, the Mariners' Chief Executive Officer, sent a letter to King County Executive, Gary Locke, in which he stated that without a new stadium, the Mariners would "offer the team for sale" after October 30. Clerk's Papers at 20, Appellants' Am.Br. at 69.
On October 11, 1995, Governor Mike Lowry called the Legislature into special session solely for "the purpose of addressing matters related to stadium financing." Clerk's Papers at 146. At that session the Legislature considered Engrossed House Bill 2115, a bill sponsored by Representatives Van Leuven and Appelwick. This measure was designed to ensure the survival of major league baseball in King County. On the day following Governor Lowry's call for a special session, public hearings on the proposal were conducted in both the Trade and Economic Development Committee of the House of Representatives and the Ways and Means Committee of the Senate. Governor Lowry testified in support of the bill at both hearings. In addition, numerous citizens testified for and against the measure.[1] Among those testifying in support of EHB 2115 were several Seattle business persons who indicated that the presence of the Seattle Mariners was essential to the success of their businesses, and that departure of the team would adversely affect them.[2] Robbie Stern, Special Assistant to the President of the Washington State Labor Council, expanded on the view of the business persons, stressing the broader impact of the Mariners on the state's economy, saying, "Here is an opportunity to use tax money to create family wage jobs and some service jobs that have health care and pension benefits; it's a good use of economic development funds." Senate Ways and Means Committee hearing tape 2 (Senate) (Oct. 12, 1995). Governor Lowry echoed these themes in his testimony before the committee of the House of Representatives, stating that the presence of the Mariners was of economic benefit to the entire state.
The Governor also stressed what he described as a "true family value question" indicating that: "Everywhere I've gone in the State, every kid has come up [to me] and said `save baseball.'" House Trade and Economic Development Committee meeting (House) tape 1 (Oct. 12, 1995). Other witnesses spoke to what they opined was the importance of major league baseball to the fabric of the community. For example, Vincent "New York Vinnie" Richichi, a Seattle sports radio talk show host, described the value of the Mariners to the community in this way: "We also have something that's an intangible here, that's our kids and a way of life. Baseball has something to do with all of that. It's a commerce for some people, it's a part of culture for some people, and for others it's a way of life." House tape 1 (Oct. 12, 1995).
As to the need for swift action by the Legislature, Governor Lowry was succinct, asking himself a seemingly rhetorical question, "Will the Mariners leave without action?" *1058 and answering it, "Yes." House tape 1 (Oct. 12, 1995).
The special session concluded on October 17, with the Legislature adopting EHB 2115 (hereinafter referred to as the Stadium Act), by a vote of 66 to 24 in the House of Representatives and 25 to 16 in the Senate. Laws of 1995, 3rd SpecSess., ch. 1. The Stadium Act authorized the creation of a public facilities district (District) in "a county with a population of one million or more," and empowered it to "acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium[.]"[3] Laws of 1995, 3rd SpecSess., ch. 1, งง 201(1) at 4, 201(4)(b) at 5. The act also provided that three members of the governing board of the District would be appointed by the Governor with the remaining members appointed by the county executive, subject to ratification by the county legislative authority. Laws of 1995, 3rd SpecSess., ch. 1, ง 302, at 10.
Significantly, the Stadium Act provided a means by which King County and the State of Washington could generate additional revenues to be allotted to the District in order to defray the major portion of the costs of constructing the new baseball stadium.[4] The act provided that moneys collected under it may only be used to pay on the bonds issued to construct the stadium. Laws of 1995, 3rd SpecSess., ch. 1, งง 101(3) at 2, 103(3) at 3, 105(5) at 4, 201(3) at 5, 203(3)(a) at 9. It also stated that the "taxes authorized [by the act] shall not be collected after June 30, 1997" unless a major league baseball team has agreed to "[c]ontribute forty-five million dollars toward the reasonably necessary preconstruction costs" of the stadium and has contracted to "[p]lay at least ninety percent of its home games in the stadium for a period of time not shorter than the term of the bonds issued to finance the initial construction of the stadium." Laws of 1995, 3rd SpecSess., ch. 1, ง 201(4)(a), (b) at 5. The Stadium Act also required the major league tenant to share a portion of any profits generated by the baseball club from the operation of the franchise for a period equal to the term of the bonds issued to finance construction of the stadium. Under this provision, shared profits were to be defined by an agreement between the stadium tenant and the District and these profits were to be used to help retire the bonds and thereafter were to go directly to the District. While the Stadium Act provided that the District was to consult with the management of the Mariners on matters such as the design, location, specifications, and budget for the baseball stadium, the ultimate decision making authority as to those issues resided with the District. Laws of 1995, 3rd SpecSess., ch. 1, ง 30(1)-(5).
Governor Lowry signed the act into law within hours of its approval by both houses of the Legislature. Three days later, Ruano attempted to file a petition for referendum with the office of the Secretary of State in order to have the Stadium Act referred to a vote of the people. Secretary of State Ralph Munro declined to accept the petition, opining that an emergency clause in the legislation exempted the Stadium Act from the referendum process.[5]
On October 23, 1995, CLEAN filed a complaint in Thurston County Superior Court against the State of Washington. In it CLEAN sought declaratory and injunctive relief, contending that the Stadium Act violated several provisions of the Washington Constitution, to wit: Wash. Const. art. VII, *1059 ง 1, art. VIII, งง 5, 7, and art. II, งง 1, 28. On December 22, 1995, Ruano filed a separate action in Thurston County Superior Court against the State and Secretery of State Ralph Munro. Ruano alleged there, as had CLEAN, that the Stadium Act was not necessary for the immediate preservation of the public peace, health or safety and, as a consequence, the emergency clause in the Stadium Act was violative of article II, section 1 of the Washington Constitution and should be declared invalid.[6] Ruano prayed for a writ of mandamus compelling the Secretary of State to process their petition for referendum.
CLEAN and Ruano each moved for summary judgment. The Thurston County Superior Court joined the hearings on both motions for argument and, following that hearing, entered a single order dismissing all of the challenges to the Stadium Act. We granted direct review of that order. Subsequently, we allowed two organizations, Citizens for More Important Things and the Public Facilities District created by the act, to appear as amici curiae and permitted each to file a brief.

I
As noted above, CLEAN contends that the Stadium Act is violative of article VII, section 1 of the Washington Constitution, a provision that all taxes "shall be levied and collected for public purposes only." CLEAN asserts that public development of a baseball stadium as a home field for the Seattle Mariners Baseball Club does not serve a public purpose, but rather serves only the interests of the Seattle Mariners Baseball Club, a private for-profit business.
CLEAN correctly observes that public funds cannot be used to benefit private interests when the public interest is not primarily being served. Japan Line, Ltd. v. McCaffree, 88 Wash.2d 93, 98, 558 P.2d 211 (1977). Public expenditures must, therefore, further public purposes. United States v. Town of North Bonneville, 94 Wash.2d 827, 832, 621 P.2d 127 (1980). "An expenditure is for a public purpose when it confers a benefit of reasonably general character to a significant part of the public." In re Marriage of Johnson, 96 Wash.2d 255, 258, 634 P.2d 877 (1981). "Where it is debatable as to whether or not an expenditure is for a public purpose, we will defer to the judgment of the legislature." Anderson v. O'Brien, 84 Wash.2d 64, 70, 524 P.2d 390 (1974).
Although no Washington case has decided whether or not a public purpose is served when the State or one of its subdivisions constructs a stadium to be leased to a professional sports franchise for use as its home field, the overwhelming majority of courts from other jurisdictions confronting this issue have determined that construction of a publicly owned stadium to be leased to professional sports teams serves a public purpose. See, e.g., Martin v. City of Philadelphia, 420 Pa. 14, 215 A.2d 894, 896 (1966) ("A sports stadium is for the recreation of the public and is hence for a public purpose."); Kelly v. Marylanders for Sports Sanity, Inc., 310 Md. 437, 530 A.2d 245, 257 (1987) ("the State's authorization for the financial support of stadium facilities [including a baseball stadium at the Camden Yards site in Baltimore] for professional sports in furtherance of public recreational activities is of long standing"); Rice v. Ashcroft, 831 S.W.2d 206, 210 (Mo.App.1991) ("[a]ny benefits to private persons... are incidental and do not take away from the primary purpose of legislationโto increase convention and sports activity in the St. Louis City-County area"); Libertarian Party v. State, 199 Wis.2d 790, 546 N.W.2d 424, 434 (1996) ("the fact that a private entity such as the [Milwaukee] Brewers will benefit from the Stadium Act does not destroy the predominant public purpose of this act").
On the other hand, public funding for facilities for professional sports teams has been rejected in at least two jurisdictions. In Brandes v. City of Deerfield Beach, 186 So. *1060 2d 6 (Fla.1966), the Florida Supreme Court ruled that construction of a spring training facility for the Pittsburgh Pirates Baseball Club did not survive a challenge that it violated a provision in the Florida Constitution allowing taxes to be imposed only for "municipal purposes, and for no other purposes." Fla. Const. art. VII, ง 9 n. 39 (West 1995). In reaching its decision, the court stated that "`municipal purposes' means ... a purpose intended to embrace some of the functions of the governmental agency." Brandes, 186 So.2d at 12.
Similarly, in Opinion of the Justices, 356 Mass. 775, 250 N.E.2d 547 (1969), the Supreme Judicial Court of Massachusetts was called upon to issue an advisory opinion as to the constitutionality of a proposal that was then pending in the Massachusetts Legislature. The proposal, if passed, would have provided a means for public financing of the construction of a general purpose sports stadium in that state. Although the Massachusetts court noted that a public purpose could, in certain instances, be served by developing a professional sports stadium, it concluded that it was "unable to advise that the stadium complex and the arena will be for a public purpose." Opinion of the Justices, 250 N.E.2d at 560. It did so, however, because it concluded that the standards governing user fees and availability of the proposed facility were not adequate.
Although we are somewhat reluctant to rely too heavily on the interpretation that the highest court of another state places on a provision in its state constitution, particularly when the provision is not identical to the pertinent provision of our constitution, we are satisfied that the cases from the jurisdictions which have held that development of a publicly owned sports stadium serves a public purpose are instructive. Significant to our determination is that Washington's standard for determining public purpose, like Pennsylvania's, Maryland's, Wisconsin's and Missouri's, is broad. As we have noted, public expenditures in Washington need only confer a benefit of reasonably general character to a significant part of the public in order to survive a challenge that they do not serve a public purpose.
The above cited cases from Florida and Massachusetts, while on the surface appearing to provide solace to CLEAN, are not fundamentally inconsistent with the cases from the other jurisdictions. The Massachusetts court, in Opinion of the Justices, did not reject the argument that development of a public stadium as a home for professional sports teams serves a public purpose. The opinion, rather, turned on other grounds. In the Brandes case, the Florida Supreme Court concluded only that "municipal purposes" were not served by constructing a spring training facility that was to be leased to a major league team. In reaching its decision, the court emphasized that the primary purpose of the proposed facility was to provide a "training'' facility for a single team and that opportunities for spectators were only incidental. It is not surprising, therefore, that the Florida court concluded that this purpose did not fall within the narrow category of a function of the governmental agency. Whether that court would have reached the same conclusion about the construction of a stadium for regular and post season major league baseball games remains an open question. Significantly, at least one other court has held that making the distinction between a spring training facility and a stadium serving as a home field for regular and post season games of a professional team is important in determining whether construction of a sports stadium serves a public purpose. See Lifteau v. Metropolitan Sports Facilities Comm'n, 270 N.W.2d 749, 753 n. 5 (Minn.1978) (in which the court approved public construction of a professional sports stadium holding that "[t]he public interest in spring training games of a single team is obviously less than the public interest in a multi-purpose stadium to be used for professional (regular season and post season) and nonprofessional athletic events and nonathletic events.").
We are satisfied, after reviewing the record here, that construction of a major league baseball stadium in King County confers a benefit of reasonably general character to a significant part of the public in King County, as well as other persons in the region, to survive a challenge that it is violative *1061 of article VII, section 1 of the Washington Constitution. In reaching this conclusion, we are not unmmdful of the fact that the Seattle Mariners may also reap benefits as the principal tenant of the publicly owned stadium that will be built as a consequence of the passage of the Stadium Act. That fact is not fatal to the act, however, as long as a public purpose is being served. The fact that private ends are incidentally advanced is immaterial to determining whether legislation furthers a public purpose. United States v. Town of North Bonneville, 94 Wash.2d 827, 834,621 P.2d 127 (1980).
Our conclusion that the Stadium Act does not run afoul of article VII, section 1 recognizes, as have the majority of courts around the nation, that public provision of a venue for professional sports franchises serves a public purpose in that the presence in a community of a professional sports franchise provides jobs, recreation for citizens, and promotes economic development and tourism. Having said that, we are aware that an argument can and has been made that few opportunities for recreation and little positive economic impact flow to a community from the presence of a major league baseball team. That argument merely underscores the fact that the degree to which the economy and quality of life of King County and the surrounding area will be enhanced by the development of a major league stadium to house the Seattle Mariners is debatable. The disagreement that underlies that debate, however, is best resolved by the people's elected representatives in the Legislature. In our judgment, they are in a superior position to evaluate the extent to which a public purpose is served by the realization of the perceived benefits. In deciding this question, we believe it was appropriate for the Legislature to consider that the concept of what is public purpose is not a static concept. Rather, it is a concept that must necessarily evolve and change to meet changing public attitudes. See BonneviUe, 94 Wash.2d at 833, 621 P.2d 127. The Legislature with its staff and committees is the branch of government better suited to monitor and assess contemporary attitudes than are the courts.

II
CLEAN also asserts that the Stadium Act violates Wash. Const. art. VIII, งง 5 and 7. It alleges, in that regard, that development of a major league stadium constitutes a gift or a loan of the State's credit in aid of a private business, the Seattle Mariners. The aforementioned constitutional provisions are as follows: "The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." Wash. Const. art. VIII, ง 5.
No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.
Wash. Const. art. VIII, ง 7. Although these two provisions are worded slightly differently, this court has held that they have identical meaning, as well as the same prohibitions and exceptions. City of Tacoma v. Taxpayers, 108 Wash.2d 679, 701 n. 13, 743 P.2d 793 (1987). "The manifest purpose of these provisions... is to prevent state funds from being used to benefit private interests where the public interest is not primarily served." Japan Line, Ltd v. McCaffree, 88 Wash.2d 93, 98, 558 P.2d 211 (1977).
A two-pronged analysis is employed to determine whether a gift of state funds has occurred. First, the court asks if the funds are being expended to carry out a fundamental purpose of the government? If the answer to that question is yes, then no gift of public funds has been made. The second prong comes into play only when the expenditures are held to not serve fundamental purposes of government. The court then focuses on the consideration received by the public for the expenditure of public funds and the donative intent of the appropriating body in order to determine whether or not a gift has occurred. Citizens for Clean Air v. City of Spokane, 114 Wash.2d 20, 39, 785 P.2d 447 (1990); Taxpayers, 108 Wash.2d at 702, 743 P.2d 793; see also Scott Paper Co. v. City of Anacortes, 90 Wash.2d 19, 33, 578 *1062 P.2d 1292 (1978) ("if intent to give a gift is lacking the elements of a gift are not present, and article 8, section 7 does not apply"). Although we have concluded above that a public purpose is served by construction of a baseball stadium, it cannot be seriously contended that the development of a baseball stadium for a major league team is a "fundamental purpose" of state government. Our inquiry must concentrate, therefore, on donative intent and consideration.
CLEAN primarily relies on Johns v. Wadsworth, 80 Wash. 352, 141 P. 892 (1914) as support for its argument that construction of a publicly funded baseball stadium to be leased to the Seattle Mariners amounts to an unconstitutional gift of public funds. In Johns, we held that a Pierce County ordinance appropriating money to a private association to enable it to put on the Western Washington Fair violated Wash. Const. art. VIII, ง 7, notwithstanding the fact that the appropriation was "to a private corporation organized for a worthy purpose, educational in its nature." Johns, 80 Wash, at 355, 141 P. 892.
CLEAN's attempt to equate Johns to the instant case is not persuasive. The expenditure of public money that was scrutinized in that case went directly to a private fair association, the county mamtaining no direct control over how the money was to be spent. Furthermore, although any building that was erected with the appropriated funds was to become the property of the county, there was no requirement in the ordinance that any of the appropriated money be devoted to the construction of buildings. Here, on the other hand, a stadium must be built with the public funds generated by the Stadium Act, and it will be owned and managed by the District, a public entity. Furthermore, any tenant, including the Mariners, will be required to pay reasonable rent to the District for the privilege of conducting its activities in the stadium. In our judgment, a plain reading of the Stadium Act reveals no intent by the Legislature to donate public funds to the Seattle Mariners.
CLEAN contends, additionally, that the act is merely an impermissible "financing conduit for private enterprise," apparently suggesting that the Stadium Act amounts to a loan of the State's credit. Appellants' Am. Br. at 34. As support for this argument, it cites Lasstta v. City of Wenatchee, 89 Wash.2d 804, 576 P.2d 54 (1978), a case in which the City of Wenatchee purchased land in that city with the express intention of selling it to a private party who intended to construct a theater on the property. We concluded that such an action was an unconstitutional lending of credit, indicating:
Purchase of property by a municipality with an intent to resell it to a private party is prohibited by Const. art. 8, ง 7. At acquisition a municipality must at very least intend a public purpose to insure that a later sale to a private party does not violate the constitutional prohibition. A municipality is absolutely prohibited from acting as a financing conduit for private enterprise.
Lassila, 89 Washed at 811, 576 P.2d 54 (citation omitted). Again, the situation we faced in Lassila is not analogous to the present case. There, the City of Wenatchee was essentially acting as a middle person for a private enterprise. Wenatchee received nothing of value for its expenditure of public money and no public purpose was served by the expenditure. Here, unlike the situation in Lassila, we can discern no intent on the part of the Legislature to have the stadium sold to the Mariners, the Stadium Act providing that ownership of the facility is to remain in the hands of the public facilities district.
In sum, we are satisfied that construction of a baseball stadium with a view to leasing it to a major league team does not amount to a gift of state funds nor a lending of the State's credit. If, as amicus Citizens For More Important Things suggests, the District should enter into an agreement with the Mariners that would permit the ball club to play its games in the stadium for only nominal rent, then the constitutional prohibitions against making a gift of state funds might be implicated. Such a circumstance is not now apparent and we will not speculate about the future. In the unlikely event that this prediction should come true, the issue can then be raised in an appropriate manner.

*1063 III
CLEAN next contends that the Stadium Act violates a constitutional prohibition against public investment in private enterprise. The provision they cite is Wash. Const. art. VIII, ง 7 which provides "[n]o county, city, town or other municipal corporation shall hereafter ... become directly or indirectly the owner of any stock in or bonds of any association, company or corporation."
CLEAN, citing Black's Law Dictionary 1586 (4th ed. 1951), posits that the term "stock" includes the "capital" of an entity and argues that in building a stadium to house the Mariners, the District would essentially be contributing a capital asset, the publicly built stadium, to the Seattle Mariners, thereby making the District, indirectly at least, part owner of the stock of the Mariners. Lending support to the claim that the District will become an indirect co-owner of the Mariners, CLEAN points out that the Mariners and the county will share a portion of the profits generated by the baseball team from the operation of the professional franchise equal to the term of the bonds issued to construct the stadium. As a consequence, they argue, the District is essentially an investor in the Mariners' private project. Laws of 1995, 3rd Spec.Sess., ch. 1, ง 201(4)(c).
CLEAN's argument in this regard is somewhat strained. Again, it ignores the fact that all of the public moneys provided by the Stadium Act will go into the construction of the stadium, a facility which will be wholly owned by the District. Although CLEAN correctly observes that any profits generated by the Mariners will be shared with the county for a period of time, and thereafter with the District, that provision in the Stadium Act simply provides security to the county in that the county's share of the profits is to be devoted to retiring the bonds that were issued to finance construction of the stadium. The provision does not make the county or the District an investor in the Mariners because at the conclusion of the term of the bonds, the District will not directly or indirectly own any part of the Seattle Mariners Baseball Club.

IV
CLEAN next contends that the Stadium Act violates Wash. Const. art. II, ง 28 because it amounts to special legislation.
The Washington Constitution provides that:
The legislature is prohibited from enacting any private or special laws in the following cases:
. . . .
(5) For assessment or collection of taxes, or for extending the time for collection thereof.
(6) For granting corporate powers or privileges.
Wash. Const. art. II, ง 28. CLEAN argues that because the Stadium Act provides a means for constructing a baseball stadium only in counties with a million or more people it is unconstitutional special legislation in that it benefits a single entity. CLEAN points out, in that regard, that only one county, King, has a population exceeding one million, thereby bringing it alone within the ambit of the act. It suggests that the Legislature's singling out of one county was simply a matter of "corporate convenience" and not rationally related to the purpose of the Stadium Act. Appellants' Am.Br. at 42.
Special legislation is legislation which operates upon a single person or entity. General legislation, on the other hand, operates upon all things or people within a class. Convention Ctr. Coalition v. City of Seattle, 107 Wash.2d 370, 380, 730 P.2d 636 (1986). A class, however, may consist of one person or corporation as long as the law applies to all members of the class. Convention Ctr., 107 Wash.2d at 380, 730 P.2d 636 (citing Libby, McNeill & Libby v. Ivarson, 19 Wash.2d 723, 730, 144 P.2d 258 (1943)).
We disagree that the Stadium Act is special legislation simply because it applies only to counties of a certain size. It is not uncommon for the Legislature to distinguish among cities on the basis of population and such legislation is upheld "[s]o long as population bears a rational relationship to the purpose and subject matter of the legislation." City of Seattle v. State, 103 Wash.2d *1064 663, 674, 694 P.2d 641 (1985). In order to "survive a challenge as special legislation, any exclusions from a statute's applicability, as well as the statute itself, must be rationally related to the purpose of the statute." City of Seattle, 103 Wash.2d at 675, 694 P.2d 641.
The purpose of the Stadium Act is to preserve the public's opportunity to view major league baseball and to maintain for the citizens of the state the economic benefits that flow from the presence of a professional sports franchise. In adopting the legislation, it was not irrational for the Legislature to limit the construction of publicly owned major league baseball stadiums to the most populous counties of the state. Although CLEAN correctly points out that only one county currently has a population exceeding one million people, it is certainly possible that in the not too distant future another county or counties may grow that large.
Furthermore, it was reasonable for the Legislature to consider that King County, our state's most populous county, currently is the only county with a major league baseball team within its boundaries. The relationship between the population of an area and its ability to put fans in the seats of the stadium is obvious. Certainly without fan support, a major league baseball franchise is doomed. With its demise, of course, go the rents payable to the District and any profits that would otherwise be paid to the county to help retire any bonds that are issued to provide funds for building the stadium. As the Wisconsin Supreme Court noted, "[g]reater population ensures more ticket sales and better corporate support. It also promises a greater economic multiplier from spending for food, lodging and entertainment, and a larger base of economic activity to generate revenue to defray the District's expenses." Libertarian Party, 546 N.W.2d at 432. Furthermore, it is beyond argument that the population of an area has a relationship to the legitimate object of providing an opportunity for citizens to view professional sportsโthe greater the population, the greater number of persons who will enjoy the experience.

V
CLEAN and Ruano both contend that section 310 of the Stadium Act, the emergency clause, violates their constitutionally protected right to referendum and, as a consequence, is invalid. More to the point, they argue that the Stadium Act was not necessary for the immediate preservation of the public peace, health or safety.
The pertinent provision in our state's constitution is article II, section 1, which provides:
LEGISLATIVE POWERS, WHERE VESTED. The legislative authority of the state of Washington shall be vested in the legislature, ... but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.
. . . .
(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, [or][7] support of the state government and its existing public institutions.
Wash. Const. art. II, ง 1 (amend. 72). According to this provision, all legislation adopted by the Legislature is subject to referendum except laws that are (1) necessary for the immediate preservation of the public peace, health or safety, or (2) in support of existing public institutions. Because it cannot seriously be contended that the Stadium Act is in support of an existing state institution, our focus will be on whether the Stadium Act was necessary for the immediate *1065 preservation of the public peace, health or safety. State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 679-81, 157 P.2d 721 (1945).
The terms "public peace, health or safety," unfortunately, are not defined in the constitution. Those terms have, however, been interpreted in cases from this court as being synonymous with an exercise of the State's "police power." See, e.g., State ex rel. Pennock v. Coe, 42 Wash.2d 569, 573, 257 P.2d 190 (1953) (this court has "upheld legislative declarations of emergency where the acts could, by reasonable inference, be said to be an exercise of the police power or in financial support of the state government or its existing institutions"); State ex rel. Pennock v. Reeves, 27 Wash.2d 739, 743, 179 P.2d 961 (1947), overruled on other grounds by Coe, 42 Wash.2d 569, 257 P.2d 190 (1953); State ex rel. McLeod v. Reeves, 22 Wash.2d 672, 674, 157 P.2d 718 (1945). The police power of the State is an attribute of sovereignty, an essential element of the power to govern, and this power exists without declaration, the only limitation upon it being that it must reasonably tend to promote some interest of the State, and not violate any constitutional mandate. Alderwood Assocs. v. Washington Envt'l Council, 96 Wash.2d 230, 252, 635 P.2d 108 (1981) (Dolliver, J., concurring).
Passing legislation which is within the police power of the State does not, however, eliminate the right of the people to refer to themselves an act passed by the Legislature. It is only a combination of the Legislature's exercise of its police power and an emergency that cancels that right. In an early case, State ex rel. Case v. Howell, 85 Wash. 281, 147 P. 1162 (1915), we described the police power exception to the right of referendum, as follows:
The clear purpose of the exception to the reserved power of referendum is to preserve unimpaired the right of the legislature to exercise this police power, but only in so far as it may be emergent. As pointed out in State ex rel. Brislawn v. Meath, 84 Wash. 302, 147 Pac. 11, the exception does not extend to all things touching the general welfare. It does not extend to things relating to mere public expediency or public convenience. It is not as broad as the police power, which is so broad and so variant with time and circumstance that its limits cannot be defined.
Howell 85 Wash, at 285, 147 P. 1162.
The State suggests that the Stadium Act is a proper exercise of the State's police power, maintaining that the existence of a major league baseball team in King County provides jobs, stimulates the economy of King County and the state, provides recreational activities for all citizens of the state as well as visitors, and contributes positively to the fabric of the community at large. The notion that the Mariners have a positive impact on the state's economy found support at the public hearing before the Trade and Economic Development Committee of the House of Representatives and the Ways and Means Committee of the Senate in the form of testimony of various business owners and a representative of organized labor, all of whom indicated how important the presence of a major league baseball team was to the economy of the region. Other witnesses concentrated on the intangible benefits that flow from the presence of having a major league baseball team in this state.[8] Governor Lowry supported both of these points of view in his testimony before the committees of the Legislature, describing how the economy of the state and the quality of life of its citizens is enhanced by the presence of a major *1066 league baseball team. If it is true that the existence of a major league baseball team in a city improves the eeonomy of the state in which that city is located and enhances the fabric of life of its citizens, and we believe it is the prerogative of the Legislature to conclude that it does, it is certainly within the general police power of the State to construct a publicly owned stadium in order to promote those interests. Although CLEAN and Ruano have submitted several articles by authors who contend that the economic benefits that a community derives from the presence of a major league baseball franchise are negligible, that determination, like the determination of what is a public purpose, discussed above, is better left to the Legislature, which can assess the relative merits of the arguments for and against a proposition.[9]
The more knotty question is whether the Stadium Act was necessary for the "immediate" preservation of the public peace, health or safety. CLEAN and Ruano contend that the threatened loss of the Mariners franchise did not present the Legislature with an emergency and that its declaration to that effect was merely a device employed to circumvent the people's power of referendum. They point out, in that regard, that "the legislature has no right to tack an emergency clause onto an act in order to prevent the people from exercising their right of referendum, unless that act is clearly within the exception set forth in the amendment." State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 776, 380 P.2d 735 (1963). The State suggests an emergency existed because in the absence of prompt legislative action a valuable community asset would be lost.
In reviewing legislative declarations of emergency we are to give substantial deference to the Legislature. As we stated in Humiston:
"`... such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no mquiry as to the facts but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. We must give to the action of the legislature and its declaration of an emergency every favorable presumption.'"
Humiston, 61 Wash.2d at 778, 380 P.2d 735 (quoting State ex rel. Hoppe v. Meyers, 58 Wash.2d 320, 326, 363 P.2d 121 (1961) (citation omitted)). "Legislative declarations of fact, such as the existence of an emergency, are deemed conclusive unless they are `obviously false and a palpable attempt at dissimulation.'" City of Tacoma v. Luvene, 118 Wash.2d 826, 851, 827 P.2d 1374 (1992) (quoting State ex rel. Hamilton v. Martin, 173 Wash. 249, 257, 23 P.2d 1 (1933)). Furthermore, "[i]f the act be doubtful, the question of emergency will be treated as a legislative question, and the doubt resolved in favor of the declaration of emergency made by the legislative body." Meath, 84 Wash, at 318, 147 P. 11.
CLEAN and Ruano assert that the facts of this case are similar to those in Humiston, where this court held that an emergency clause in legislation authorizing and regulating certain gambling activities did not meet the test set down in that case. We stated there that "[w]e are unable to equate pinball machines [], punchboards [], bingo [], and cardrooms [] to an immediate threat to the populace." Humiston, 61 Wash.2d at 780, 380 P.2d 735. We went on to say that the act in question was "patently devoid of any facts relating to an emergency (with the exception *1067 of the emergency clause itself)." Humiston, 61 Wash.2d at 778, 380 P.2d 736.
The facts in Humiston can easily be distinguished from those of the instant case. In Humiston, we were confronted with legislation purporting to legalize certain gambling activities such as cardrooms, punchboards, etc. Clearly a provision authorizing gambling activities which had previously been illegal could not be considered as a response to an emergency. Here, the situation is far different. From the record we have reviewed, including the record of the proceedings before the committees of the House and Senate and that of the debates on the floor of both houses of the Legislature, we are satisfied that the Legislature acted to maintain major league baseball in this state in the face of a clear and present danger that this State's existing major league baseball franchise, the Seattle Mariners, would depart this state if prompt action was not taken to assure that a new publicly owned stadium would be developed in King County. The specter of this loss was a circumstance that the Legislature reasonably could believe would result in a loss of jobs, tax revenue, recreational opportunities, while at the same time Diminishing the quality of life for a substantial number of this state's citizens.
CLEAN and Ruano argue that the lack of an emergency is apparent because there is no indication in the Stadium Act, other than the bare declaration of emergency, as to why the Legislature concluded that an emergency existed. They contend also that the lack of a baseball stadium for a major league team can hardly be equated with an immediate threat to the populace. On the latter point, we would have to agree with CLEAN and Ruano that the prospect of losing a major league baseball franchise cannot be said to be an emergency of apocalyptic dimensions. On the other hand, the Legislature was faced with a real emergency in the sense that the public purpose they sought to achieve by passing the Stadium Act would be unattainable if the Mariners franchise was sold to investors from another area before the Legislature could assure the owners of that franchise that a new baseball stadium would be developed in King County. In short, the Legislature was justified in concluding that quick action was needed to preserve the baseball franchise for the state of Washington and that any delay would lead to the sale of the Mariners, thereby defeating the purpose of the legislation.
On Ruano's and Scannell's other point, they are correct that the Stadium Act does not, on its face, articulate with any specificity why an emergency was deemed to be present. There are, however, facts in the record that may be judicially noticed which indicate why the Legislature concluded that quick action was justified. Facts which a court may judicially notice are those "facts capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy and verifiable certainty." Humiston, 61 Wash.2d at 779, 380 P.2d 735.
First, it is cognizable that Governor Lowry called a special session of the Legislature for the sole purpose of dealing with the stadium issue. While the calling of a special session by the State's chief executive is not determinative of the existence of an emergency, it does, in our judgment, support the argument that an emergency existed. Indeed, if prompt action had not been called for, the Governor and the Legislature could merely have waited for the Legislature's regular session which was scheduled three months hence in order to deal with the issue. The fact that they did not choose to wait for the upcoming regular session strongly suggests that they perceived that the State was faced with an emergency.
Secondly, the urgency of the situation faced by the Legislature was noted on the floor of both houses. During the debate in the House of Representatives on October 13, 1995, several House members stressed the need for quick action. One of the bill's sponsors, Representative Appelwick, stated:
We now have a much fuller appreciation of the public support for baseball in the northwest and the desire to keep the team here. To do that we have to act on a stadium and the council has to act on a stadium by the end of the month. *1068 House of Representatives floor debate of EHB 2115 audio tape (House floor debate) (Oct. 13, 1995). Another representative, Dale Foreman, stated:
They [the Mariners] do bring something of extraordinary value to the State of Washington, baseball is important and we knew that our job was to fashion a bill that would keep the Mariners here if at all possible. It will solve the problem that we were brought here to correct ... and if we don't do something about it, we will lose the Mariners.
House floor debate (Oct. 13, 1995).
Finally, the record contains evidence that a sale of the Mariners was a distinct possibility if action by the Legislature was not taken by October 30. As noted above, the chief executive officer of the Seattle Mariners, John Ellis, wrote to King County Executive Gary Locke, indicating that the Mariners would wait only until October 30 before offering the team for sale. Moreover, the state's chief executive, apparently taking the Mariners' warning seriously, took the unusual step of testifying before hearings of committees of both houses of the Legislature to advise that unless quick action was taken, the Mariners would leave this state.[10] While it is possible that Ellis's statement was merely an idle threat or that a buyer for the team was not likely to appear even if the promise to sell was real, it was not unreasonable for the Governor and, more importantly, the Legislature, to conclude otherwise.[11] On these questions we must again defer to the Legislature's judgment.
The dissent makes the point that the fact that the taxes provided for in the Stadium Act could not be collected under the act until January 1, 1996 belies the existence of emergency. If an emergency existed, the dissent suggests, the act should have provided that taxes be gathered immediately upon passage of the act (October 17, 1995). While it is true that the state and local taxes provided for in the act Could not be collected until January 1, 1996, that fact is really insignificant. The emergency that the Legislature faced was the prospect of losing the Mariners. That emergency would not be mitigated simply by early collection of tax revenue. Rather, it was the commitment of the state of Washington to provide the means by which an outdoor baseball stadium could be built that was calculated to keep the Mariners in Seattle.
Ultimately, the emergency that faced the Legislature was that the Seattle Mariners would be put up for sale on October 30 unless, prior to that date, the Legislature enacted legislation that would assure the development of a new publicly owned baseball stadium in King County. The solution the Legislature concluded was viable was one that made the development of a stadium contingent upon the King County Council acting in concert with the Legislature by increasing local taxes that the Stadium Act authorized it to increase. Consequently, for the enactment to accomplish its purpose, it had to take effect immediately in order to give the King County Council time to deliberate and act, if it were inclined to do so, prior to October 30.
In sum, although cogent arguments for and against the Stadium Act were presented to the Legislature, it had before it considerable evidence that the Stadium Act would promote the general welfare of the citizenry, and that the state was faced with an emergency which made it necessary for the act to take effect immediately. As noted above, this court is required to grant considerable deference to the Legislature's determination *1069 that an emergency exists, giving it every favorable presumption and deferring to its judgment unless it is obvious that the declaration of emergency is false.
In reaching our conclusion that the Legislature's determination that an emergency was present here, we take particular note of the fact that the bill which eventually became the Stadium Act was not merely a proposal among many others that somehow managed to emerge during an eleventh hour scramble to complete a session. Rather, it was the product of a rare, if not unprecedented, special session at which both houses of the Legislature devoted their attention for nearly a week to only one proposalโthe Stadium Act. The dissent would have us sweep aside the declaration of emergency, apparently believing that this court should substitute its judgment on that score for that of the Legislature's.[12] In our view, that would be most unwise and would constitute a major assault on the historic balance of powers. Of the three branches of government, the Legislature is best able to consider what measures promote the general welfare and the degree to which prompt legislative action is required. In this case, where there is nothing before us that suggests that the Legislature acted improperly or that the declaration was a mere ruse to avoid the people's power of referendum, we should uphold its action. Our decision in this regard is not, as the dissent suggests, inimical to the people's right of referendum. Rather it recognizes that in order for some legislation to accomplish the purposes intended by the Legislature, it must take effect immediately.[13]

VI
In conclusion, we are satisfied that the Stadium Act survives all of the constitutional challenges asserted by CLEAN and Ruano. We, therefore, affirm the Thurston County Superior Court's order dismissing their lawsuits.
DURHAM, C.J., and DOLLJVER, SMITH, JOHNSON and TALMADGE, JJ., concur.
TALMADGE, Justice (concurring).
I agree with the majority opinion in its analysis of the critical issues in this case. I write separately to emphasize the appropriate test in cases involving the validity of an emergency clause placed in a bill by the Legislature.[1]
Our constitution in article II, section 1, empowers the Legislature to declare legislation necessary for the support of the state government and its existing public institutions or for the preservation of public peace, health or safety. With such a declaration, the legislation becomes effective immediately and is not subject to a referendum. While the dissent correctly discerns we should be vigilant of the people's right to a referendum, the constitution itself affords the Legislature, a coordinate branch of state government, the specific power to declare an emergency when legislating. We need to be cognizant of this constitutional apportionment of power as well.
*1070 In general, this Court has been exceedingly reluctant, and properly so, to intrude upon the decisionmaking process of a coordinate branch of state government. The examples of such reluctance are numerous and varied. We have declined to interfere with the Legislature's right to refer a bill to the people. Walker v. Munro, 124 Wash.2d 402, 423, 879 P.2d 920 (1994). Under the enrolled bill doctrine, we do not inquire into the Legislature's process for enacting legislation. State ex rel. Reed v. Jones, 6 Wash. 452, 34 P. 201 (1893).[2] Similarly, with respect to gubernatorial sectional vetoes, we give considerable deference to the Legislature's designation of sections subject to the veto power. Washington State Motorcycle Dealers Ass'n v. State, 111 Wash.2d 667, 763 P.2d 442 (1988).
As the majority notes, a similar policy of deference applies to legislative declarations of an emergency: "Legislative declarations of fact, such as the existence of an emergency, are deemed conclusive unless they are `obviously false and a palpable attempt at dissimulation.'" (Emphasis added.) City of Tacoma v. Luvene, 118 Wash.2d 826, 851,827 P.2d 1374 (1992), quoting State ex rel. Hamilton v. Martin, 173 Wash. 249, 257, 23 P.2d 1 (1933). In fact, an "aura of conclusiveness" surrounds such declarations because we presume the Legislature acted "appropriately and affirmatively" in determining the fact. Hoppe v. State, 78 Wash.2d 164, 170, 469 P.2d 909 (1970).
Yet, the dissent argues for an entirely new principle governing relations between this Court and the Legislature, a relationship rife with opportunities for unbridled judicial activism ultimately requiring us to substitute our judgment, without the benefit of committee hearings and public testimony, for that of the people's elected legislative representatives and the Governor. The majority properly rejects such a principle.
The most troublesome aspect of the dissent's analysis, however, is the notion a legislative declaration of fact, such as an emergency, is subject to intrusive judicial review. Dissent at 1076-78, 1079-83.[3] The dissent apparently finds, without a shred of supporting evidence in the record, the legislative declaration of an emergency to meet our standard of review as an "obviously false and a palpable attempt at dissimulation," and substitutes its judgment for that of the Legislature and Governor, finding no emergency.
The dissent ignores our long-established rule conferring an "aura of conclusiveness" upon legislative declarations and propounds a new rule requiring the Legislature to tell what the emergency is to avoid invalidation by this Court. But even announcing the nature of the emergency is not enough for the dissent. The dissent would still retain for this Court the power "to independently draw the correct legal conclusion." Dissent at 1083. The dissent offers no guidance as to how the Court would conduct this independent fact-finding expedition. This new rule, created by the dissent out of whole cloth, does severe violence to the most fundamental notions of separation of powers underlying the American form of government.
The dissent apparently believes the Legislature must make findings of fact regarding the existence of an emergency, subject to judicial review on some unspecified standard. Dissent at 1079-80, 1082, 1083.[4] Does the *1071 dissent contend this Court should review legislative declarations of fact de novo, or perhaps on a substantial evidence test? How does the dissent propose to determine the "evidence" to support legislative findings? Can facts extrinsic to legislative deliberations be part of the record? Must the Legislature take specific evidence in its committee deliberations? Will the debate on the floor of both houses constitute the necessary evidence? Does the dissent believe individual legislators should be deposed to see if their intent in declaring an emergency was "legitimate" in the Court's all-intrusive scrutiny? Does the dissent believe there must be a trial on the validity of every challenged emergency clause in a bill? The dissent does not answer any of these practical questions in its analysis, yet would have this Court intrude into the processes of a coordinate branch of government.
Without any effort to cite to the record, the dissent tosses off a series of accusations against the Legislature that are inexcusably unsubstantiatedโthe emergency clause is "boDerplate" (Dissent at 1079, 1081); the emergency clause may have been added to escape public scrutiny and the referendum process (Dissent at 1074-75, 1079, 1081-82); the emergency clause was "tacked on" (Dissent at 1083); the clause was "Orwellian" in its declaration of an emergency (Dissent at 1075). Indeed, the dissent states: "... this emergency clause appears to have been added solely to avoid a possible referendum, not to substantially speed the effective date of the legislation." Dissent at 1074-75.
Such unsupported assertions are insulting to the men and women of the Legislature attempting in good faith to serve the people. But such statements are pernicious also because they are not borne out on the record in this case. The dissent can point to nothing in the record or the legislative history of the legislation to document its sweeping and unfounded charges. In fact, the record plainly contradicts the dissent's statements.
Reviewing the legislative declaration of an emergency requires us to discern from the face of the legislation, and from any facts of which we can take judicial notice, whether the legislative declaration is "obviously false and a palpable attempt at dissimulation." The burden of proving an emergency clause invalid rests squarely on the party challenging the clause. Hoppe, 78 Wash.2d at 170, 469 P.2d 909. In undertaking our review, based on the legislation itself and our judicial knowledge, we must be cognizant of the separation of powers and the appropriate role of each branch of our government. Fact-finding is left to the Legislature: "The authority and duty to ascertain the facts which ought to control legislative action are, from the necessity of the case, devolved by the constitution upon those to whom it has given the power to legislate, and their decision that the facts exist is conclusive upon the courts." Hamilton v. Martin, 173 Wash. 249, 258, 23 P.2d 1 (1933). In exercising our judicial knowledge, we can look to the factors that prompted the action of the Legislature, the subjective understanding of the Governor and legislators regarding the emergency, and any other objective factors bearing on the legislative decisionmaking.
Objectively, from the face of the bill and from the facts of which we can take judicial notice, the owners of the Seattle Mariners advised Gary Locke, the King County Executive, by letter dated September 28, 1995, the team would be placed up for sale by October 30 (and presumably would leave Seattle). While the dissent does not believe such a deadline was truly emergent, the Governor and the legislative leadership did, recalling the loss of the Seattle Pilots, a previous major league baseball franchise that left for Milwaukee in 1969, and the movement of other professional franchises. See, e.g., Seattle Seahawks, Inc. v. King County, 128 Wash.2d 915, 913 P.2d 375 (1996).
The Governor and legislative leadership, in a spirit of bipartisan cooperation, agreed on a special session of the Legislature. This was not an act undertaken in partisan lockstep. *1072 The session was confined to the single topic of the baseball stadium, an exceedingly rare occurrence.[5]
Throughout that session, the stadium legislation considered in the House and Senate contained an emergency clause. The clause was not "tacked on" surrepttiously or at the last moment in considering the bill.[6] Most significantly, although 40 legislators ultimately voted against the bill on the merits, no legislator in the House or Senate offered an amendment either in committee or on the floor to delete the emergency clause.[7] Such an amendment would have afforded stadium opponents the clear opportunity to argue the emergency was not present. No legislator accused the bill sponsors of attempting to avoid a referendum. Apparently, even opponents of the bill in the Legislature conceded an emergency was present.
Thus, looking at the factors prompting the bill, the process by which the bill was enacted, the subjective belief of the Governor and the legislators who worked on the bill, and the face of the legislation itself, reveals that the appellants have not borne their burden; nothing in the record suggests the emergency declaration was "obviously false and a palpable attempt at dissimulation."

CONCLUSION
The Legislature attempted to deal with what it believed was an emergency. Legislators are, and were in this case, answerable for their decision to the voters at the next election. In addition to that electoral remedy, opponents of the bill also had the first right of the people, the initiative, available to them to challenge the legislation.
The dissent accuses the Governor and Legislature of perpetrating a falsehood in declaring an emergency to willfully deprive the people of their right to vote on the bill in a referendum. However, in a case on which the dissent relies heavily for support, we said this Court will never presume "that the [Legislature deliberately intended to infringe upon a constitutional right." Kennedy v. Reeves, 22 Wash.2d 677, 683-84, 157 P.2d 721 (1945). The dissent's harsh, and unfounded, accusation is without merit, and reflects a reckless willingness to throw off the fetters of judicial restraint and impose judicial policy preferences on the people of Washington.
While it is certainly true the Legislature should generally assist the courts by clarifying the basis for declaration of a fact, like an emergency, in the legislation itself or the legislative history, the record here offers no evidence the Legislature was motivated by a desire to consciously circumvent the people's right of initiative in adopting an emergency clause in Engrossed House Bill 2115. Thus, we have no constitutional charter to secondguess the Governor and the Legislature in their good faith effort to address and resolve a significant public controversy. The emergency clause in Engrossed House Bill passes the test set in our constitution.
DOLLIVER, J., concurs.
GUY, Justice (concurring and dissenting).
While I agree that the Stadium Act is otherwise constitutional, I cannot agree that it qualifies as "emergency" legislation. By *1073 declaring the raising of taxes to build a sports stadium an emergency, the Act effectively prevents the people of this state from conducting a referendum on the new law. This is contrary to our state constitution which assures the right of referendum to the citizens of our state unless legislation is necessary for the immediate preservation of the public peace, health or safety. Wash. Const. art. II, ง 1 (amend. LXXII). While baseball is close to the heart of many of us, and I understand that a major league baseball team in our state brings economic and social benefits, I cannot agree that raising money for the building of a new stadium is an "emergency."
This Court should, and will, give the Legislature's declaration of an emergency every favorable presumption. However, in giving deference, we must 63842-0; 63843-8 do so with this Court's constitutional duty in mind. We have a duty to test the emergency clause against the backdrop of the constitutional right of referendum. We are not free to rubber-stamp an emergency clause when there are no facts recited in the legislation, or apparent from the subject of the legislation, or judicially known to the Court, which would support the existence of an emergency.
I will defer to the judgment of the Legislature whenever an "emergency" situation, such as an immediately effective consequence, is explained in the preamble of an act or in the emergency clause itself, or is apparent from the nature of the act. The Stadium Act before us provides no facts on which to base deference to the legislative decision. The emergency clause contains only standard, generic language, and there is no other indication in the legislation as to why the Legislature decided to declare the Act to be an emergency. Nothing in the legislation supports an inference that through application of common sense or judicial knowledge we could conclude that funding a new sports stadium is necessary for the immediate preservation of the public peace, health or safety.
I therefore respectfully dissent on the issue concerning Washington Const. art. II, ง 1 (amend. LXXII). I would find the Act otherwise constitutional but would allow the people of this State their normal right of referendum and would direct the Secretary of State to accept the petition.
SANDERS, Justice (dissenting).
By judicial fiat the majority and concurrence virtually eliminate the people's constitutional right to referendum by leaving it to the tender mercies of the Legislature. I would rather heed the warning of Chief Justice Marshall, "We must never forget that it is a Constitution we are expounding,"[1] by applying the original text as written:

Article II

Legislative Department
ง 1. Legislative Powers, Where Vested.
The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section, or part of any bill, act, or law passed by the legislature.
. . . .
(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions....
(c) No act, law, or bill subject to referendum shall take effect until ninety days after the adjournment of the session at which it was enacted.... *1074 Const. art. II, ง 1 (amend. VII) (emphasis added).[2]
The issue is whether the Stadium Act (attached verbatim in Appendix A), which imposes taxes to possibly build a stadium, is necessary for the immediate preservation of the public peace, health, or safety. The majority claims it is. Let us test that claim against the constitution itself.

A few important facts
The facts are straightforward. In 1995 the Legislature authorized King County to impose a sales tax by local ordinance to pay for a baseball stadium. The taxing ordinance was put to county referendum but was rejected at the polls by voters in the very county where the stadium was to be located.
The Governor immediately called the Legislature into special session for the sole purpose of enacting a tax which could be used to fund a stadium of similar design. The Stadium Act[3] authorizes a combination of state and local taxes to raise an additional $314 million. In legal effect, the Act authorizes and imposes several taxes but does nothing to mandate construction of a stadium or keep a baseball team. Since the statute was passed as an alleged "emergency," it became effective immediately. However, the Act says that the taxes may not be imposed prior to January 1; whereas, if not for the emergency clause, the taxes could have been imposed on January 15, i.e., 90 days from the end of the special session.
While the Stadium Act generally authorizes new and/or higher state and local taxation to begin on January 1, 1996, and also generally provides that the taxes so collected shall be dedicated to a stadium purpose, these taxes will continue to be collected until at least June 30, 1997, whether or not the stadium is ever constructed and whether or not there is a team to play in it.
However, assuming no stadium is built and no baseball team remains or is secured, there is no provision whatsoever in the enactment to refund to the taxpayers those enhanced taxes collected between January 1, 1996 and June 30, 1997. The government may well claim that under such a scenario it is entitled to retain the revenue collected for stadium purposes in its general fund to be expended for other purposes rather than refunding the same plus interest back to the taxpayers.
The Act provides that after June 30, 1997 the major league team must agree to "share... profits" (ง 201(4)(c)). However, this is illusory because it does not set the share nor does it apply if there are none.
The Stadium Act does not tell us why passage of the Act is necessary for the "immediate preservation of the public peace, health or safety." It contains no legislative declarations of fact whatsoever, although at its end it does contain a so-called emergency clause identical, word for word, to the constitutional provision:
This act is necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and shall take effect immediately.
Laws of 1995, 3d SpecSess., ch. 1, ง 310. The reason why this Act is emergently necessary is left to the imagination.
The statute immediately took effect on October 17. But a citizens' group promptly requested the Secretary of State to begin the referendum process by accepting for filing its typewritten copy of the Stadium Act (the proposed subject of referendum) accompanied by its filing fee. See RCW 29.79.010, RCW 43.07.120.
Our state constitution reserves for the people the right to put any statute passed by the Legislature to popular referendumโwith one narrow exception: a statute is not subject to referendum if it is "necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions." Const. art. II, ง 1(b) (amend. VII). The Secretary of State leaped into the breech of that narrow *1075 exception and refused to process the referendum. Hence, this suit followed.

Purpose of emergency exception to referendum power
The threshold issue is whether the Stadium Act is "necessary for the immediate preservation of the public peace, health or safety." Const. art. II, ง 1(b) (amend. VII). If so, the Secretary of State properly refused the referendum filing. If not, we must order the Secretary to follow the mandatory constitutional process.
Usually emergency clauses are added to make enactments effective immediately to avoid the normal 90-day waiting period before an act otherwise takes effect. See State v. Hayes, 108 Wash.2d 344, 345-46, 738 P.2d 276 (1987); Const. art. II, ง 1(c) (amend. VII). However, this emergency clause appears to have been added solely to avoid a possible referendum, not to substantially speed the effective date of the legislation. Indeed, the State's brief argues that it is the risk of delay "incidental to a submission of [the] measure to a popular vote" that renders the Act emergent. Br. of Resp'ts State of Washington at 36.

The Act judged against constitutional standard
This constitutional exception to the popular right of referendum on its face conditions the exception by imposing three mandatory requirements: (1) the necessity must be immediate; (2) the statute must be necessary to solve the problem; and (3) the problem must be of a particular kind, i.e., a disruption of the "public peace," "health," or "safety." However, this Act satisfies none of the mandatory criteria. Collection of the tax is not so immediate that the ordinary 90-day delay in the effective date of the statute matters. The majority admits the date the tax becomes effective is "really insignificant." Majority at 1068. Nor does this statute preserve the "public peace," "health," or "safety" in any sense other than Orwellian. Further, even if we were to assume that the purpose of the Act is to finance a stadium on an emergent basis, the Act would still not otherwise qualify for referendum exception because the Act in no way legally obligates anyone to build a stadium, nor does it lawfully require such a stadium to be built, nor does it lawfully require a professional team to remain to play in it.
Although not in the record, if it were necessary to pass the Act for some reason prior to October 30 (see Majority at 1068), the Legislature accomplished that by special session. However that is certainly not justification under the constitution for an emergency clause which is wholly a different issue.
Common sense interpretation is not and should not be foreign to judicial decisionmaking. In fact, this court has always said the first rule of constitutional construction is "We will presume the language carries its ordinary and popular meaning...." Westerman v. Cary, 125 Wash.2d 277, 288, 892 P.2d 1067 (1994); see Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491 (1984). We have also held constitutional clauses such as the referendum power must be read "as the average informed lay voter would read it" because the State Constitution and all subsequent amendments were ratified by popular vote, not by the Legislature alone.[4]Washington State Motorcycle Dealers Ass'n v. State, 111 Wash.2d 667, 674, 763 P.2d 442 (1988) (quoting Estate of Turner v. Department of Revenue, 106 Wash.2d 649, 654, 724 P.2d 1013 (1986)).

*1076 The role of referendum in our system

Article II of our constitution allocates legislative power between the people and the Legislature. The very first sentence of article II, section 1, expressly states that, while generally the legislative power is vested in the Legislature, "the people reserve to themselves" the power of referendum. This reservation goes to the heart of our system and reflects the constitutional mandate that "All political power is inherent in the people, and governments derive their just powers from the consent of the governed" (Const. art. I, ง 1), while also reflecting the fact that the state constitution is most importantly a limitation on the power of the state Legislature. In re Elliott, 74 Wash.2d 600, 604, 446 P.2d 347 (1968).[5] By the constitutional text the people's power of referendum is superior to and antagonistic to the normal prerogatives of the Legislature. This court has characterized the popular right of initiative and referendum as "the first of all the sovereign rights of the citizenโthe right to speak ultimately and finally in matters of political concern...." State ex rel. Mullen v. Howell, 107 Wash. 167, 171, 181 P. 920 (1919). Appointing the Legislature to guard the people's right to refer legislation to referendum is appointing the fox to guard the henhouse.
The power of referendum was added by the seventh amendment to our state constitution in 1912. This referendum power created a sort of fourth branch of government whereby the "people reserv[e] the right to assert its will over the legislative department of the government." State ex rel. Brislawn v. Meath, 84 Wash. 302, 318, 147 P. 11 (1915). The question before us is not a question involving the separation of judicial from legislative power but the separation of the power of the people from legislative encroachment.
As the Court of Appeals observed in 1993, the people passed the seventh amendment "because they had become impressed with a profound conviction that the legislature had ceased to be responsive to the popular will." Save Our State Park v. Hordyk, 71 Wash. App. 84, 89, 856 P.2d 734 (1993) (citing State ex rel. Mullen v. Howell, 107 Wash. 167, 172, 181 P. 920 (1919)). An early Washingtonian noted that the referendum's purpose is to "democratize legislation, to enable people to assume control of affairs, and to insure responsible as well as responsive government...."[6] We have also held that by enacting the seventh amendment, the people "fixed a limit beyond which the legislature cannot go without doing violence to the will and voice of the people." State ex rel. Gray v. Martin, 29 Wash.2d 799, 804, 189 P.2d 637 (1948).

Judicial review of emergency clauses liberally prefers referendum
The majority claims: "The dissent would have us sweep aside the declaration of emergency, apparently believing that this court should substitute its judgment on that score for that of the Legislature." Majority at 1069. Apparently the majority believes the Legislature should be free to act without independent judicial review of the constitutionality of its actions. This is an interesting debating point, however, it was rejected in the Federalist Papers[7] and again in Marbury *1077 v. Madison[8]
To the contrary, since the popular ratification of the referendum amendment, our courts have repeatedly considered suits brought by citizens daiming that various legislative acts should face a referendum despite dubious legislative claims that the law was necessary to remedy some alleged emergency. Over the years our court has enforced a "delicate balance" between preserving the people's right to referendum while allowing the Legislature to pass immediately effective laws in response to true emergencies. State ex rel. Humiston v. Meyers, 61 Wash.2d 772, 777, 380 P.2d 735 (1963). To aid this inquiry, we have adopted and followed a set of judgemade rules. The purpose of these rules is to aid enforcement of the constitution; it certainly is not to defeat it.
As a preliminary matter, this court has always held that it is our solemn constitutional duty to substantively review legislative declarations of emergency as a judicial question. Id. at 777, 380 P.2d 735 (emphasis added).[9] We have held that to allow the Legislature to define emergency without review "is to write this reservation out of the Constitution." State ex rel. Brislawn v. Meath, 84 Wash. 302, 311, 147 P. 11 (1915).
Additionally, we have held that the referendum and initiative clauses should be "liberally construed" to favor upholding the people's right to referendum and initiative. Sudduth v. Chapman, 88 Wash.2d 247, 251, 558 P.2d 806, 559 P.2d 1351 (1977); State ex rel Howell v. Superior Court, 97 Wash. 569, 577, 166 P. 1126 (1917); State ex rel. Case v. *1078 Superior Court, 81 Wash. 623, 632, 143 P. 461 (1914). But this is precisely opposite from what the majority does here.

"Public peace, health or safety" much narrower than general police power
The majority's basic fallacy is its assertion that "public peace, health or safety" means the same as anything the Legislature is authorized to do under its broad police power. Majority at 1065.
The question of whether an act is "necessary for the immediate preservation of public peace, health or safety" is often expressed in shorthand as whether the Act is an "emergency". Common sense dictates that a tax, much less a stadium, is not an "emergency," at least in the sense of being "necessary for the immediate preservation of the public peace, health or safety, [or] support of the state government and its existing public institutions." Even the majority admits that "losing a major league baseball franchise cannot be said to be an emergency of apocalyptic dimensions." Majority at 1067. Moreover, this Act does not legally prohibit that loss in any event.
The test as to whether or not a statute is within the police power is much broader than the test as to whether the statute fits within the narrow exception of the referendum clause. If the question of "whether the statute falls within the police power" were the same as "whether or not the statute is subject to referendum," we would never have a referendum to consider since, as a general matter, the state may not constitutionally legislate beyond its police power in any event. Washington Kelpers Ass'n v. State, 81 Wash.2d 410, 502 P.2d 1170 (1972), cert. denied, 411 U.S. 982, 93 S.Ct. 2274, 36 L.Ed.2d 959 (1973).
Contrary to the majority's claim, we have consistently held that the emergency exception is much narrower than the police power. For example, in State ex rel. Case v. Howell we explained,
the [emergency] exception does not extend to all things touching the general welfare. It does not extend to things relating to mere public expediency or public convenience. It is not as broad as the police power, which is so broad and so variant with time and circumstance that its limits cannot be defined.[[10]]
Howell 85 Wash, at 285, 147 P. 1162.
State ex rel. Robinson v. Reeves, 17 Wash.2d 210, 135 P.2d 75, 146 A.L.R. 280 (1943) struck down the emergency clause in a statute that was passed to purchase several large utility companies. There we explained "`[p]romotion of the public welfare' is not a criterion by which we may be guided in determining whether or not an emergency exists which defeats the right to refer the Act to the peopleโthis, very simply, because it is not a criterion set up in ง 1(b) of the seventh amendment." Id. at 217, 135 P.2d 75. Instead, the court "[r]evert[ed] to the constitutional provision" and required that the law go directly to the immediate preservation of the public peace, health, or safety. Id. at 215, 216, 135 P.2d 75."[11] And, indeed, acquiring public utilities is more akin to the proper role of government than imposing a tax to perhaps build a baseball stadium[12] by what appellants characterize as "the confiscation of property to assist private corporations or enterprises," (quoting Journal of the Washington State Constitutional Convention *1079 1889 at 682 (B. Rosenow ed. 1962) (quoting J.Z. Moore)). Appellants Amended Br. at 20.[13]
We have held "[p]eace, health and safety..... refer to perils which may beset the state or its citizens...." State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 274, 148 P. 28 (1915). In 1945, State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 681, 157 P.2d 721 explained the intended scope of the emergency exception:
During a legislative session, it might appear that legislation was immediately required to avert immediate danger to the public peace. An epidemic of vast proportions might be threatening the public health, or some great catastrophe might require immediate relief. The amendment, wisely and indeed necessarily, guarded against such contingencies....
The true definition of the phrase "necessary for the immediate preservation of the public peace, health or safety," to which we have long adhered, is its ordinary, obvious one. I cannot stretch the ordinary meaning of these words far enough to honestly conclude that this tax is truly necessary for the immediate preservation of the public peace, for the immediate preservation of public safety, or for the preservation of public health. The constitutional exception to referendum is not so infinitely broad that this Act and almost everything else will fit within it.

Emergency clause suspect when standing alone
A secondary consideration is what proof the court will consider to determine whether an emergency of the kind set forth in the constitution in fact exists.
The concurrence states: "Our constitution in article II, section 1, empowers the Legislature to declare legislation necessary for the support of the state government and its existing public institutions or for the preservation of public peace, health or safety." Concurrence at 1069 (emphasis added). If the constitutional text empowers the "Legislature to declare" anything, it would take a vigilant jurist to find it since it must be written in invisible ink.
Nearly 1,000 statutes on the books have boilerplate emergency clauses. I strongly disagree with the majority's "safety in numbers" or "floodgates" argument which essentially claims that if we were to protect our citizens' right to referendum we could do nothing else and, therefore, we shouldn't do anything. Majority at 1069 n. 12. We must be clear that our courts are open to hear these claims in discharge of our paramount duty to protect the constitutional rights of the people. The fact that the people's rights are being violated en masse is an even greater reason for judicial intervention than invasion by occasional inadvertent mistake.
Moreover, these claims are not heard "de novo" in the supreme court. They originate in the superior court and reach the supreme court only by discretionary review. If there is a great deal of litigation over this matter, we have only ourselves to blame for not articulating the simple and mandatory rule that, in effect, the constitution means exactly what it says and that any legislative enactment which simply relies upon a boilerplate emergency clause, without also meeting the exacting constitutional criteria, is subject to attack. Repetition of this legislative conduct has been encouraged by the unwillingness of this court to discharge its constitutional duty. Frankly, I find the majority's argument on this point untenable.
Accordingly, this court has always looked with disfavor on the Legislature's "custom of attaching emergency clauses to all sorts of bills, many of which cannot by any stretch of the imagination be regarded as actually emergent...." State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 683, 157 P.2d 721 (1945). Once again our Court of Appeals persuasively observed "[p]resumably to escape public scrutiny and the referendum process, the Legislature had begun to insert `emergency clauses' in a number of bills." *1080 Save Our State Park v. Hordyk, 71 Wash. App. 84, 90 n. 6, 856 P.2d 734 (1993).[14]
When faced with an emergency clause, the court must independently determine whether an emergency actually exists and whether the challenged statute actually addresses it. State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 679-81, 157 P.2d 721 (1945) ("Unless we can say that the act is, in fact, necessary for the immediate preservation of the public peace, or for the immediate preservation of the public health, or for the support of the state government and its existing public institutions, the relators are of right entitled to the writ prayed for." Id. at 682, 157 P.2d 721.). This is the essence of judicial review which is the constitutional responsibility of this court. Const. art. IV.

Facts which may be considered
To exempt an act from a possible referendum, the existence of a true emergency of a particular kind must be factually proven. The burden should be on the one who asserts that the exemption is applicable since the constitional rule is clearly otherwise, and we presume that the act is subject to referendum unless the contrary is clearly proven. Humiston, 61 Wash.2d at 776, 380 P.2d 735.[15] The court often gleans these "facts" from "what appears upon the face of the act, aided by the court's judicial knowledge." State ex rel Humiston v. Meyers, 61 Wash.2d 772, 778, 380 P.2d 735 (1963) (quoting State ex rel. Hoppe v. Meyers, 58 Wash.2d 320, 326, 363 P.2d 121 (1961)). When the Legislature includes a statement of fact in the statute upon which it bases its declaration of emergency, the court will generally give such factual finding considerable deference. "We have always held to the rule that the legislative declaration of the facts constituting the emergency is conclusive, unless, giving effect to every presumption in its favor, the court can say that such legislative declaration, on its face, is obviously false and a palpable attempt at dissimulation." State ex rel. Hamilton v. Martin, 173 Wash. 249, 257, 23 P.2d 1 (1933) (emphasis added).
In State ex rel. Hamilton v. Martin, the Legislature passed a law appropriating money to alleviate statewide unemployment. Id. at 253-54, 23 P.2d 1. There the Legislature included an emergency clause. Id. at 252, 23 P.2d 1. However, the Legislature also stated specific facts supporting a state of emergency including "`Discontent, social unrest and incipient insurrection exist. Acts of insurrection are occurring.'" Id. at 256-57, 23 P.2d 1 (quoting Laws of 1933, ch. 65, ง 1, referred to as the "Bond Act"). Further, the court in that case was able to take judicial notice[16] of *1081 the widespread hunger and privation existing in 1933 which will, if "unrelieved, inevitably lead to disorder and reprisal" and found it to be reasonable that the law was designed to "prevent insurrection by civilized methods, rather than by violence and bloodshed." Id. at 256, 259, 23 P.2d 1. Because of the specific facts set out in the law, along with the court's judicial knowledge, the law was deemed a true emergency of the kind enumerated by the constitution and a referendum was not constitutionally required.
However, this deference is afforded only when the Legislature factually states the nature and scope of the emergency. We have never given the Legislature such deference when all it includes is a naked emergency clause without additional factual support for the alleged underlying emergency itself. In Humiston, one of our most recent cases on the issue, we held, despite the fact that the insertion of an emergency clause was identical to the one used in the Stadium Act, the law there making bingo and cardrooms lawful in certain situations was nevertheless subject to referendum. 61 Wash.2d at 774, 380 P.2d 735. We reasoned that "[t]he face of the act is patently devoid of any facts relating to an emergency (with the exception of the emergency clause itself)." Id. at 778, 380 P.2d 735.
This rule goes back to the very first referendum case we decided. In State ex rel. Brislaum v. Meath, 84 Wash. 302, 305, 147 P. 11 (1915), the issue was whether the Legislature's insertion of an emergency clause alone, without inclusion of the underlying facts of emergency, would be sufficient to establish an emergency upon review by this court. We began by noting that while the judiciary is hesitant to place restraints upon legislative discretion, the Legislature's declaration of emergency goes not to legislative discretion, but to its constitutional powerโthe Legislature may circumvent the people's right of referendum only if an emergency of a particular kind truly exists. Id. at 314, 147 P. 11. The court wrote: "`The said legislative declaration [of emergency] has no greater effect and is no more binding upon the court than if the Legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine.'" Id. at 316, 147 P. 11 (citations omitted).
We have repeatedly adhered to the rule set out in Brislawn. In State ex rel. Kennedy v. Reeves, 22 Wash.2d 677, 157 P.2d 721 (1945), the Legislature inserted a boilerplate emergency clause identical to that used in the present case into an act on timber resource use. When a citizen called for a referendum, this court wrote that the Legislature "cannot defeat the constitutional right [to referendum] ... by merely inserting [an emergency clause]...." Id. at 681, 157 P.2d 721. The court reasoned that, "It would be scandalous indeed if the constitutional right of referendum could be thwarted by the mere use of [an emergency clause and] .... `[i]f this can be done, the right of referendum is a dead letter in this state.'" Id. at 681-82, 157 P.2d 721 (quoting oral argument). Is this not the exact result of the majority opinion?
The rule in Humiston is: "the legislature has no right to tack an emergency clause onto an act in order to prevent the people from exercising their right of referendum, unless that act is clearly within the exception set forth in the amendment." 61 Wash.2d 772, 776, 380 P.2d 735 (1963) (emphasis added).
Here, the Legislature used a boilerplate[17] emergency clause without even attempting to justify any exception to the right of referendum. *1082 In fact, the Legislature merely copied the constitutional provision into the statute.
Perhaps a few indisputable facts are subject to judicial notice such as the failure of the earlier referendum and the fact of a special session;[18] however, potentially disputed facts cannot be noticed but must be "found" the old fashioned wayโwith a judge, trial, witnesses, cross-examination, etc. See footnote 16, supra.
Quite the contrary to the rule stated in Humiston, I find my brethren in the majority delve extensively into extraneous debatable matters neither reflected in the text of the statute nor within notice of the judiciary. For example, we are told about small children expressing their affection of baseball to the Governor. Majority at 1057. We are told about hearsay testimony from interested persons which says nothing about any real or imagined immediate threat to the public peace, health, or safety. We are told what a good public investment this will be.[19] Perhaps most interestingly, we are told that *1083 this unusual piece of legislation slid through a special session of the Legislature with bipartisan support from not only legislators and the executive, but also from a united front of business, labor, and professional sports entrepreneurs, each of whom would hope to benefit at taxpayers' expense. Majority at 1057. But we are told nothing about the views of taxpayers who voted down a similar measure in King County.[20] I presume these references to matters outside the judicial notice rule were simply made in the interest of thoroughness. Certainly they would have no proper influence on the outcome of this constitutional question if we applied the established rule of law.
To summarize the established rule, when the Legislature tacks on an emergency clause without telling what the emergency is, and judicially noticeable facts (see footnote 16, supra) do not clearly support its presence, we presume no emergency and strike the clause. However, when the Legislature goes further and tells us what the nature of the emergency is, we give such factual findings deference but do not abdicate our judicial duty to independently draw the correct legal conclusion.
While the referendum process may be burdensome and the people may at times decline to spend or act as a majority of the Legislature would prefer, that is no reason to alter the mandatory constitutional division of power between the people and the Legislature. As the Court of Appeals stressed when discussing the "importance of initiatives and referendums":
The people have a right to adopt any system of government they see fit to adopt. In its workings, it may not meet their expectations; it may be unwieldy and cumbersome; it may tend to inconvenience and prodigality; it may be the expression of a passion or sentiment rather than of sound reason; but it is the people's government and, until changed by them, must be observed by the legislature and protected by the courts.
Save Our State Park v. Hordyk, 71 Wash. App. 84, 90, 856 P.2d 734 (1993) (citing State ex rel. Brislawn v. Meath, 84 Wash. 302, 320, 147 P. 11 (1915)).[21]
Unless the people repeal the constitutional right of referendum, we must uphold their right to pass on all issues other than those which actually and truly fall within the narrow exception. The words of this court 50 years ago are as true now as then: "To uphold a legislative declaration of emergency such as this would destroy the referendum and would permit the legislature, or a group of electors barely sufficient to invoke an initiative, to impose its will upon the majority...." State ex rel. Robinson v. Reeves, 17 Wash.2d 210, 217, 135 P.2d 75, 146 A.L.R. 280 (1943).[22]

Other substantive constitutional challenges premature before referendum
Given my conclusion that this Act is subject to the referendum process, I will not consider CLEAN's other claims that the act is substantively unconstitutional. (See State ex rel. O'Connell v. Kramer, 73 Wash.2d 85, 86-87, 436 P.2d 786 (1968) and State ex rel. Donahue v. Coe, 49 Wash.2d 410, 418, 302 P.2d 202 (1956)). James D. Gordon III & David B. Magleby, Pre-Electixm Judicial Review of Initiatives and Referendums, 64 Notre Dame L.Rev. 298, 320 (1989) ("[C]ourts should not conduct pre-election review of a measure's substantive validity because it involves issuing an advisory opinion, violates *1084 ripeness requirements and the policy of avoiding unnecessary constitutional questions, and interferes with a legislative process.").

Conclusion
Authorizing or imposing a tax such as this has never been considered "necessary for the immediate preservation of public peace, health or safety," nor should it be considered so today simply because it relates to baseball, hardly a core function of government much less an emergency of the kind to which Article II refers.
Allowing the Legislature to exempt its own questionable acts from referendum gives it an unfair, unconstitutional advantage over those citizens who may disagree with that judgment.
This majority is firmly on the Legislature's team judging from its virtual repeal of the constitutional guaranty that the people may make their voice heard through the referendum process. The new rule appears to be: "If the Legislature says that the legislation is exempt from referendum, it is."
The majority's decision is terribly misguided. It simply cannot coexist with that referendum power which is constitutionally reserved to the peopleโthe same power the founding citizens who ratified the constitution purposefully withheld from the Legislature. The decision is tantamount to dismissing a constitutional challenge to any statute because the Legislature has inserted a clause declaring the act to be constitutional. Brislaum, 84 Wash, at 316, 147 P. 11.
A majority of this court would have the judiciary cease to function independently from the Legislature as it will not enforce the rules against the Legislature. That isn't what umpires are supposed to do. I'd call this one for the people and the constitution, not the Legislature. Unfortunately the score is Legislature 6, People 3. I dissent.
MADSEN J., concurs.

APPENDIX A

CHAPTER 1

[Engrossed House Bui 2115]

BASEBALL STADIUM FINANCING
AN ACT Relating to financing public sports facilities; amending RCW 46.16.301, 46.16.313, 67.70.240, 82.14.360, 35.21.280, 36.38.010, 36.100.010, 36.100.020, 39.10.120, 39.10.902, and 82.29A.130; adding a new section to chapter 82.14 RCW; adding a new section to chapter 67.70 RCW; adding new sections to chapter 36.100 RCW; creating new sections; and declaring an emergency.
Be it enacted by the Legislature of the State of Washington:

PART I

STATE CONTRIBUTION
NEW SECTION. Sec. 101. A new section is added to chapter 82.14 RCW to read as follows:
(1) The legislative authority of a county with a population of one million or more may impose a sales and use tax in accordance with the terms of this chapter. The tax is in addition to other taxes authorized by law and shall be collected from those persons who are taxable by the state under chapters 82.08 and 82.12 RCW upon the occurrence of any taxable event within the county. The rate of tax shall not exceed 0.017 percent of the selling price in the case of a sales tax or value of the article used in the case of a use tax.
(2) The tax imposed under subsection (1) of this section shall be deducted from the amount of tax otherwise required to be collected or paid over to the department of revenue under chapter 82.08 or 82.12 RCW. The department of revenue shall perform the collection of such taxes on behalf of the county at no cost to the county.
(3) Moneys collected under this section shall only be used for the purpose of paying the principal and interest payments on bonds issued by a county to construct a baseball stadium.
(4) No tax may be collected under this section before January 1, 1996, and no tax may be collected under this section unless the taxes under RCW 82.14.360 are being *1085 collected. The tax imposed in this section shall expire when the bonds issued for the construction of the baseball stadium are retired, but not more than twenty years after the tax is first collected.
(5) As used in this section, "baseball stadium" means a baseball stadium with natural turf and a retractable roof or canopy, together with associated parking facilities, constructed in the largest city in a county with a population of one million or more.
Sec. 102. RCW 46.16.301 and 1994 c 194 s 2 are each amended to read as follows:
(1) The department may create, design, and issue special license plates that may be used in lieu of regular or personalized license plates for motor vehicles required to display two motor vehicle license plates, excluding vehicles registered under chapter 46.87 RCW, upon terms and conditions established by the department. The special plates may:
(a) Denote the age or type of vehicle; or
(b) Denote special activities or interests; or
(c) Denote the status, or contribution or sacrifice for the United States, the state of Washington, or the citizens of the state of Washington, of a registered owner of that vehicle; or
(d) Display a depiction of the name and mascot or symbol of a state university, regional university, or state college as defined in RCW28B.10.016.
(2) The department shall create, design, and issue a special baseball stadium license plate that may be used in lieu of regular or personalized license plates for motor vehicles required to display two motor vehicle license plates, excluding vehicles registered under chapter 46.87 RCW, upon terms and conditions established by the department. The special plates shall commemorate the construction of a baseball stadium, as defined in section 101 of this act. The department shall also issue to each recipient of a special baseball stadium license plate a certiffcate of participation in the construction of the baseball stadium.
(3) The department has the sole discretion to determine whether or not to create, design, or issue any series of special license plates, other than the special baseball stadium license plate under subsection, and whether any interest or status merits the issuance of a series of special license plates. In making this determination, the department shall consider whether or not an interest or status contributes or has contributed significantly to the public health, safety, or welfare of the citizens of the United States or of this state or to their significant benefit, or whether the interest or status is recognized by the United States, this state, or other states, in other settings or contexts. The department may also consider the potential number of persons who may be eligible for the plates and the cost and efficiency of producing limited numbers of the plates. The design of a special license plate shall conform to all requirements for plates for the type of vehicle for which it is issued, as provided elsewhere in this chapter.
Sec. 103. RCW 46.16.313 and 1994 c 194 s 4 are each amended to read as foDows:
(1) The department may establish a fee for each type of special license plates issued under RCW 46.16.301(1)(a), (b), or (c) in an amount calculated to offset the cost of production of the special license plates and the administration of this program. The fee shall not exceed thirty-five dollars and is in addition to all other fees required to register and license the vehicle for which the plates have been requested. All such additional special license plate fees collected by the department shall be deposited in the state treasury and credited to the motor vehicle fund.
(2) In addition to all fees and taxes required to be paid upon application, registration, and renewal registration of a motor vehicle, the holder of a collegiate license plate shall pay a fee of thirty dollars. The department shall deduct an amount not to exceed two dollars of each fee collected under this subsection for administration and collection expenses incurred by it. The remaining proceeds, minus the cost of plate production, shall be remitted to the custody *1086 of the state treasurer with a proper identifying detailed report. The state treasurer shall credit the funds to the appropriate collegiate license plate fund as provided in RCW28B.10.890.
(3) In addition to all fees and taxes required to be paid upon application, registration, and renewal registration of a motor vehicle, the holder of a special baseball stadium license plate shall pay a fee of thirty dollars. The department shall deduct an amount not to exceed two dollars of each fee collected under this subsection for administration and collection expenses incurred by it. The remaining proceeds, minus the cost of plate production, shall be distributed to a county for the purpose of paying the principal and interest payments on bonds issued by the county to construct a baseball stadium, as defined in section 101 of this act, including reasonably necessary preconstruction costs, while the taxes are being collected under RCW 82.14.360. After this date, the state treasurer shall credit the funds to the state general fund.
NEW SECTION. Sec. 104. A new section is added to chapter 67.70 RCW to read as follows:
The lottery commission shall conduct at least two but not more than four scratch games with sports themes per year. These games are intended to generate additional moneys sufficient to cover the distributions under RCW 67.70.240(5).
Sec. 105. RCW 67.70.240 and 1987 c 513 s 7 are each amended to read as follows:
The moneys in the state lottery account shall be used only: (1) For the payment of prizes to the holders of winning lottery tickets or shares; (2) for purposes of making deposits into the reserve account created by RCW 67.70.250 and into the lottery aoininistrative account created by RCW 67.70.260; (3) for purposes of making deposits into the state's general fund; (4) for purposes of making deposits into the housing trust fund under the provisions of section 7 of this 1987 act; (5) for distribution to a county for the purpose of paying the principal and interest payments on bonds issued by the county to construct a baseball stadium, as defined in section 101 of this act, including reasonably necessary preconstruction costs; (6) for the purchase and promotion of lottery games and game-related services; and (6) (7) for the payment of agent compensation. Three million dollars shall be distributed under subsection (5) of this section during calendar year 1996. During subsequent years, such distributions shall equal the prior year's distributions increased by four percent. Distributions under subsection (5) of this section shall cease when the bonds issued for the construction of the baseball stadium are retired, but not more than twenty years after the tax under section 101 of this act is first imposed.
The office of financial management shall require the allotment of all expenses paid from the account and shall report to the ways and means committees of the senate and house of representatives any changes in the allotments.
NEW SECTION. Sec. 106. Sections 101 through 105 of this act constitute the entire state contribution for a baseball stadium, as defined in section 101 of this act. The state will not make any additional contributions based on revised cost or. revenue estimates, cost overruns, unforeseen circumstances, or any other reason.

PART II

LOCAL FUNDING
Sec. 201. RCW 82.14.360 and 1995 1st sp.s. c 14 s 7 are each amended to read as follows:
(1) The legislative authority of a county with a population of one million or more operating undor a county charter may impose a special stadium sales and use tax by resolution adopted on or beforo December 31, 1995, for collection following its approval by a majority of the voters in the county at a genoral or special election upon the retail sale or use within the county by restaurants, taverns, and bars of food and beverages that are taxable by the state under chapters 82.08 and 82.12 RCW. The rate of the tax shall not exceed five-tenths of one percent of the *1087 selling price in the case of a sales tax, or value of the article used in the case of a use tax. The tax imposed under this subsection is in addition to any other taxes authorized by law and shall not be credited against any other tax imposed upon the same taxable event. As used in this section, "restaurant" does not include grocery stores, mini-markets, or convenience stores.
(2) The legislative authority of a county with a population of one million or more may impose a special stadium sales and use tax upon retail car rentals within the county that are taxable by the state under chapters 82.08 and 82.12 RCW. The rate of the tax shall equal one-tenth of one not exceed two percent of the selling price in the case of a sales tax, or rental value of the article used vehicle in the case of a use tax. The tax imposed under this section subsection is in addition to any other taxes authorized by law and shall not be credited against any other tax imposed upon the same taxable event.
(3) The revenue from the tax taxes imposed under this section shall be used for the purpose of principal and interest payments on bondSj issued by a public facilitios district, croatod within the county under chapter 36.100 RCW, to acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium with a retractable roof or canopy and natural turf. Revenues from the taxes authorized in this section may be used for design and other preconstruction costs of the baseball stadium until bonds are issued for the baseball stadium. The county shall issue bonds, in an amount determined to be necessary by the public facilities district, for the district to acquire, construct, own, and equip the baseball stadium. The county shall have no obligation to issue bonds in an amount greater than that which would be supported by the tax revenues under this section, section 101 of this act, and RCW 36.38.010(3)(a) and (b). If the revenue from the tax, taxes imposed under this section exceeds the amount needed for such principal and interest payments in any year, the excess shall be used solely:
(a) For either or both: (a) early retirement of the bonds issued for the baseball stadium; or
(b) retirement of bonds issued for expand ing, remodelling, repairing, or reequipping of a multipurpose stadium that has a seating capacity over fortyfive thousand and
(b) If the revenue from the taxes imposed under this section exceeds the amount needed for the purposes in (a) of this subsection in any year, the excess shall be placed in a contingency fund which may only be used to pay unanticipated capital costs on the baseball stadium, excluding any cost overruns on initial construction.
(4) The tax taxes authorized under this section may shall not be collected only after June 30, 1997, unless the county executive has certified to the department of revenue that a professional major league baseball team has made a binding and legally enforceable contractual commitment to:
(a) Play at least ninety percent of its home games in the stadium for a period of time not shorter than the term of the bonds issued to finance the initial construction of the stadium;
(b) Contribute principal of forty-five million dollars toward the bonded reasonably necessary preconstruction costs including, but not limited to architectural, engineering, environmental, and legal services, and the cost of construction of the stadium, or to any associated public purpose separate from bond-financed property, including without limitation land acquisition, parking facilities, equipment, infrastructure, or other similar costs associated with the project, which contribution shall be made during a term not to exceed the term of the bonds issued to finance the initial construction of the stadium. If all or part of the contribution is made after *1088 the date of issuance of the bonds, the team shall contribute an additional amount equal to the accruing interest on the deferred portion of the contribution, calculated at the interest rate on the bonds maturing in the year in which the deferred contribution is made. No part of the contribution may be made without the consent of the county until a public facilities district is created under chapter 36.100 RCW to acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium. To the extent possible, contributions shall be structured in a manner that would allow for the issuance of bonds to construct the stadium that are exempt from federal income taxes; and
(c) Share a portion of the profits generated by the baseball team from the operation of the professional franchise for a period of time equal to the term of the bonds issued to finance the initial construction of the stadium, after offsetting any losses incurred by the baseball team after the effective date of chapter 14, Laws of 1995 1st sp. sess. Such profits and the portion to be shared shall be defined by agreement between the public facilities district and the baseball team. The shared profits shall be used to retire the bonds issued to finance the initial construction of the stadium. If the bonds are retired before the expiration of their term, the shared profits shall be paid to the public facilities district.
(5) No tax may be collected under this section before January 1, 1996. Before collecting the taxes under this section or issuing bonds for a baseball stadium, the county shall create a public facilities district under chapter 36.100 RCW to acquire, construct, own, remodel, maintain, equip, reequip, repair, and operate a baseball stadium.
(6) The county shall assemble such real property as the district determines to be necessary as a site for the baseball stadium-Property which is necessary for this purpose that is owned by the county on the effective date of this section shall be contributed to the district, and property which is necessary for this purpose that is acquired by the county on or after the effective date of this section shall be conveyed to the district.
(7) The proceeds of any bonds issued for the baseball stadium shall be provided to the district.
(8) As used in this section, "baseball stadium" means "baseball stadium" as defined in section 101 of this act.
(9) The tax taxes imposed under this section shall expire when the bonds issued for the construction of the new public facilities baseball stadium are retired, but not later than twenty years after the tax is taxes are first collected.
Sec. 202. RCW 35.21.280 and 1995 1st sp. s. c 14 s 8 are each amended to read as follows:
Every city and town may levy and fix a tax of not more than one cent on twenty cents or fraction thereof to be paid by the person who pays an admission charge to any place: PROVIDED, No city or town shall impose such tax on persons paying an admission to any activity of any elementary or secondary school. This includes a tax on persons who are admitted free of charge or at reduced rates to any place for which other persons pay a charge or a regular higher charge for the same privileges or accommodations. A city that is located in a county with a population of one million or more may not levy a tax on events in stadia constructed on or after January 1, 1995, that are owned by county government or a public facilities district under chapter 36.100 RCW and that have seating capacities over forty thousand. The city or town may require anyone who receives payment for an admission charge to collect and remit the tax to the city or town.
The term "admission charge" includes:
(1) A charge made for season tickets or subscriptions;
(2) A cover charge, or a charge made for use of seats and tables reserved or otherwise, and other similar accommodations;
*1089 (3) A charge made for food and refreshment in any place where free entertainment, recreation or amusement is provided;
(4) A charge made for rental or use of equipment or facilities for purposes of recreation or amusement; if the rental of the equipment or facilities is necessary to the enjoyment of a privilege for which a general admission is charged, the combined charges shall be considered as the admission charge;
(5) Automobile parking charges if the amount of the charge is determined according to the number of passengers in the automobile.
Sec. 203. RCW 36.38.010 and 1995 1st sp. s. c 14 s 9 are each amended to read as follows:
(1) Any county may by ordinance enacted by its county legislative authority, levy and fix a tax of not more than one cent on twenty cents or fraction thereof to be paid for county purposes by persons who pay an admission charge to any place, including a tax on persons who are admitted free of charge or at reduced rates to any place for which other persons pay a charge or a regular higher charge for the same or similar privileges or accommodations; and require that one who receives any admission charge to any place shall collect and remit the tax to the county treasurer of the county: PROVIDED, No county shall impose such tax on persons paying an admission to any activity of any elementary or secondary school.
(2) As used in this chapter, the term "admission charge" includes a charge made for season tickets or subscriptions, a cover charge, or a charge made for use of seats and tables, reserved or otherwise, and other similar accommodations; a charge made for food and refreshments in any place where any free entertainment, recreation, or amusement is provided; a charge made for rental or use of equipment or facilities for purpose of recreation or amusement, and where the rental of the equipment or facilities is necessary to the enjoyment of a privilege for which a general admission is charged, the combined charges shall be considered as the admission charge. It shall also include any automobile parking charge where the amount of such charge is determined according to the number of passengers in any automobile.
(3) The tax herein authorized shall not be exclusive and shall not prevent any city or town within the taxing county, when authorized by law, from imposing within its corporate limits a tax of the same or similar kind: PROVIDED, That whenever the same or similar kind of tax is imposed by any such city or town, no such tax shall be levied within the corporate limits of such city or town by the county, except that the legislative authority of a county with a population of one million or more may exclusively levy a tax taxes on events in stadiums constructed on or after January 1, 1995, that are owned by county government or a public facilities district under chapter 36.100 RCW and that have seating capacities over forty thousand at the rates of:
(a) Not more than one cent on twenty cents or fraction thereof
(4) By contract, the county shall obligate itself to provide the revenue from the tax authorized by this section of events in stadia owned, managed, or operated by a public facilities district, having seating capacities over forty thousand, and constructed on or after January 1, 1995, to the public facilities district., to be used for the purpose of paying the principal and interest payments on bonds issued by a county to construct a baseball stadium as defined in section 101 of this act. If the revenue from the tax exceeds the amount needed for that purpose, the excess shall be placed in a contingency fund which may only be used to pay unanticipated capital costs on the baseball stadium, excluding any cost overruns on initial construction; and
(b) Not more than one cent on twenty cents or fraction thereof, to be used for the purpose of paying the principal and interest payments on bonds issued by a county to construct a baseball stadium as defined in section 101 of this act. The tax imposed under this subsection (3)(b) shall expire when the bonds issued for the construction of the baseball stadium are retired, but not later *1090 than twenty years after the tax is first collected.

PART III

MISCELLANEOUS
Sec. 301. RCW 36.100.010 and 1995 1st sp. s. c 14 s 1 are each amended to read as follows:
(1) A public facilities district may be created in any county and shall be coextensive with the boundaries of the county.
(2) A public facilities district shall be created upon adoption of a resolution providing for the creation of such a district by the county legislative authority in which the proposed district is located.
(3) A public facilities district is a municipal corporation, an independent taxing "authority" within the meaning of Article VII, section 1 of the state Constitution, and a "taxing district" within the meaning of Article VII, section 2 of the state Constitution.
(4) No taxes authorized under this chapter may be assessed or levied unless a majority of the voters of the public facilities district has approved such tax at a general or special election. A single ballot proposition may both validate the imposition of the sales and use tax under RCW 82.14.048 and the excise tax under RCW 36.100.040.
(5) A public facilities district shall constitute a body corporate and shall possess all the usual powers of a corporation for public purposes as well as all other powers that may now or hereafter be specifically conferred by statute, including, but not limited to, the authority to hire employees, staff, and services, to enter into contracts, and to sue and be sued.
(6) The county legislative authority or the city council may transfer property to the public facilities district as part of the process of creating the public facilities district created under this chapter. No property that is encumbered with debt or that is in need of major capital renovation may be transferred to the district without the agreemen of the district and revenues adequate to retire the existing indebtedness.
Sec. 302. RCW 36.100.020 and 1995 1st sp.s. c 14 s 2 are each amended to read as follows:
(1) A public facilities district shall be governed by a board of directors consisting of five or seven members as provided in this section. If the largest city in the county has a population that is at least forty percent of the total county population, the board of directors of the public facilities district shall consist of five members selected as follows: (a) Two members appointed by the county legislative authority to serve for four-year staggered terms; (b) two members appointed by the city council of the largest city in the county to serve for four-year staggered terms; and (c) one person to serve for a four-year term who is selected by the other directors. If the largest city in the county has a population of less than forty percent of the total county population, the county legislative authority shall establish in the resolution creating the public facilities district whether the board of directors of the public facilities district has either five or seven members, and the county legislative authority shall appoint the members of the board of directors to reflect the interests of cities and towns in the county, as well as the unincorporated area of the county. However, if the county has a population of one million or more, the largest city in the county has a population of less than forty percent of the total county population, and the county operates under a county charter, which provides for an elected county executive, three members shall be appointed by the governor and the remaining members shall be appointed by the county executive subject to confirmation by the county legislative authority. Of the members appointed by the governor, the speaker of the house of representatives and the majority leader of the senate shall each recommend to the governor a person to be appointed to the board.
(2) At least one member on the board of directors shall be representative of the lodging industry in the public facilities district *1091 before the public facilities district imposes the excise tax under RCW 36.100.040.
(3) Members of the board of directors shall serve four-year terms of office, except that two of the initial five board members or three of the initial seven board members shall serve two-year terms of office.
(4) A vacancy shall be filled in the same manner as the original appointment was made and the person appointed to fill a vacancy shall serve for the remainder of the unexpired term of the office for the position to which he or she was appointed.
(5) director appointed by the governor may be removed from office by the governor. Any other director may be removed from office by action of at least two-thirds of the members of the legislative authority which made the appointment.
NEW SECTION. Sec. 303. A new section is added to chapter 36.100 RCW to read as foDows:
In addition to other powers and restrictions on a public facilities district, the following shall apply to a public facilities district, located in a county with a population of one million or more, that constructs a baseball stadium:
(1) The public facilities district, in consultation with the professional baseball team that will use the stadium, shall have the authority to determine the stadium site;
(2) The public facilities district, in consultation with the professional baseball team that will use the stadium, shall have the authority to establish the overall scope of the stadium project, including, but not limited to, the stadium itself, associated parking facilities, associated retail and office development that are part of the stadium facility, and ancillary services or facilities;
(3) The public facilities district, in consultation with the professional baseball team that will use the stadium, shall have the final authority to make the final determination of the stadium design and specifications;
(4) The public facilities district shall have the authority to contract with the baseball team that will use the stadium to obtain architectural, engineering, environmental, and other professional services related to the stadium site and design options, environmental study requirements, and obtaining necessary permits for the stadium facility;
(5) The public facilities district, in consultation with the professional baseball team that will use the stadium, shall have the authority to establish the project budget and bidding specifications and requirements on the stadium project;
(6) The public facilities district, in consultation with the professional baseball team that will use the stadium and the county in which the public facilities district is located, shall have the authority to structure the financing of the stadium facility project; and
(7) The public facilities district shall consult with the house of representatives executive rules committee and the senate facilities and operations committee before selecting a name for the stadium.
As used in this section, "stadium" and "baseball stadium" mean a "baseball stadium" as defined in section 101 of this act.
NEW SECTION. Sec. 304. A new section is added to chapter 36.100 RCW to read as follows:
A public facilities district may accept and expend moneys that may be donated for the purpose of a baseball stadium as defined in section 101 of this act.
Sec. 305. RCW 39.10.120 and 1994 c 132 s 12 are each amended to read as follows:
(1) Except as provided in subsection (2) of this section, the alternative public works contracting procedures authorized under this chapter are limited to public works contracts signed before July 1, 1997. Methods of pubhe works contracting authorized by RCW 39.10.050 and 39.10.060 shall remain in full force and effect until completion of contracts signed before July 1, 1997.
(2) For the purposes of a baseball stadium as defined in section 101 of this act, the design-build contracting procedures under RCW 39.10.050 shall remain in full force and effect until completion of contracts signed before December 31, 1997.
*1092 Sec. 306. RCW 39.10.902 and 1994 c 132 s 15 are each amended to read as follows:
The following acts or parts of acts, as now existing or hereafter amended, are each repealed, effective July 1, 1997:
(1) RCW 39.10.010 and 1994 c 132 s 1;
(2) RCW 39.10.020 and 1994 c 132 s 2;
(3) RCW 39.10.030 and 1994 c 132 s 3;
(4) RCW 39.10.040 and 1994 c 132 s 4;
(5) RCW 39.10.050 and 1994 c 132 s 5;
(6) RCW 39.10.060 and 1994 c 132 s 6;
(7) RCW 39.10.070 and 1994 c 132 s 7;
(8) RCW 39.10.080 and 1994 c 132 s 8;
(9) RCW 39.10.090 and 1994 c 132 s 9;
(10) RCW 39.10.100 and 1994 c 132 s 10;
(11) RCW 39.10.110 and 1994 c 132 s 11;
(12) RCW 39.10.120 and 1994 c 132 s 12;
(13) RCW 39.10.900 and 1994 c 132 s 13;
(14)(13) RCW 39.10.901 and 1994 c 132 s 14; and
(15)(14) RCW 39.10.902 and 1994 c 132 s 15.
Sec. 307. RCW 82.29A.130 and 1995 c 138 s 1 are each amended to read as follows:
The following leasehold interests shall be exempt from taxes imposed pursuant to RCW 82.29A.030 and 82.29A.040:
(1) All leasehold interests constituting a part of the operating properties of any public utility which is assessed and taxed as a public utility pursuant to chapter 84.12 RCW.
(2) All leasehold interests in facilities owned or used by a school, college or university which leasehold provides housing for students and which is otherwise exempt from taxation under provisions of RCW 84.36.010 and 84.36.050.
(3) All leasehold interests of subsidized housing where the fee ownership of such property is vested in the government of the United States, or the state of Washington or any political subdivision thereof but only if income qualification exists for such housing.
(4) All leasehold interests used for fair purposes of a nonprofit fair association that sponsors or conducts a fair or fairs which receive support from revenues collected pursuant to RCW 67.16.100 and allocated by the director of the department of agriculture where the fee ownership of such property is vested in the government of the United States, the state of Washington or any of its political subdivisions: PROVIDED, That this exemption shall not apply to the leasehold interest of any sublessee of such nonprofit fair association if such leasehold interest would be taxable if it were the primary lease.
(5) All leasehold interests in any property of any public entity used as a residence by an employee of that public entity who is required as a condition of employment to live in the publicly owned property.
(6) All leasehold interests held by enrolled Indians of lands owned or held by any Indian or Indian tribe where the fee ownership of such property is vested in or held in trust by the United States and which are not subleased to other than to a lessee which would qualify pursuant to this chapter, RCW 84.36.451 and 84.40.175.
(7) All leasehold interests in any real property of any Indian or Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States: Provided, that this exemption shall apply only where it is determined that contract rent paid is greater than or equal to ninety percent of fair market rental, to be determined by the department of revenue using the same criteria used to establish taxable rent in RCW 82.29A.020(2)(b).
(8) All leasehold interests for which annual taxable rent is less than two hundred fifty dollars per year. For purposes of this subsection leasehold interests held by the same lessee in contiguous properties owned by the same lessor shall be deemed a single leasehold interest.
(9) All leasehold interests which give use or possession of the leased property for a continuous period of less than thirty days: PROVIDED, That for purposes of this subsection, successive leases or lease renewals giving substantially continuous use of possession of the same property to the same lessee *1093 shall be deemed a single leasehold interest: PROVIDED FURTHER, That no leasehold interest shall be deemed to give use or possession for a period of less than thirty days solely by virtue of the reservation by the public lessor of the right to use the property or to allow third parties to use the property on an occasional, temporary basis.
(10) All leasehold interests under monthto-month leases in residential units rented for residential purposes of the lessee pending destruction or removal for the purpose of constructing a public highway or building.
(11) All leasehold interests in any publicly owned real or personal property to the extent such leasehold interests arises solely by virtue of a contract for public improvements or work executed under the public works statutes of this state or of the United States between the public owner of the property and a contractor.
(12) All leasehold interests that give use or possession of state adult correctional facilities for the purposes of operating correctional industries under RCW 72.09.100.
(13) All leasehold interests used to provide organized and supervised recreational activities for disabled persons of all ages in a camp facility and for public recreational purposes by a nonprofit organization, association, or corporation that would be exempt from property tax under RCW 84.36.030(1) if it owned the property. If the publicly owned property is used for any taxable purpose, the leasehold excise taxes set forth in RCW 82.29A.030 and 82.29A.040 shall be imposed and shall be apportioned accordingly.
(14) All leasehold interests in the public or entertainment areas of a baseball stadium with natural turf and a retractable roof or canopy that is in a county with a population of over one million, that has a seating capacity of over forty thousand, and that is constructed on or after January 1, 1995. "Public or entertainment areas" include ticket sales areas, ramps and stairs, lobbies and concourses, parking areas, concession areas, restaurants, hospitality and stadium club areas, kitchens or other work areas primarily servicing other public or entertainment areas, public rest room areas, press and media areas, control booths, broadcast and production areas, retail sales areas, museum and exhibit areas, scoreboards or other public displays, storage areas, loading, staging, and servicing areas, seating areas and suites, the playing field, and any other areas to which the public has access or which are used for the production of the entertainment event or other pubhe usage, and any other personal property used for these purposes. "Public or entertainment areas" does not include locker rooms or private offices exclusively used by the lessee.
NEW SECTION. Sec. 308. The public facilities district, the county, and the city with the largest population in the county shall enter into an agreement regarding the construction of a baseball stadium as defined in section 101 of this act. The agreement shall address, but not be limited to:
(1) Expedited permit processing for the design and construction of the project;
(2) Expedited environmental review processing;
(3) Expedited processing of requests for street, right of way, or easement vacations necessary for the construction of the project; and
(4) Other items deemed necessary for the design and construction of the project.
NEW SECTION. Sec. 309. Part headings as used in this act constitute no part of the law.
NEW SECTION. Sec. 310. This act is necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing pubhe institutions, and shall take effect immediately.
Passed the House October 14, 1995.
Passed the Senate October 14, 1995.
Approved by the Governor October 17, 1995.
Filed in the Office of the Secretary of State October 17, 1995.
NOTES
[1] Persons testifying in support of the bill far outnumbered those speaking in opposition. For example, at the Senate Ways and Means Committee hearing, the number of persons speaking in support of the bill was 48. Only five persons spoke in opposition.
[2] One witness, Mick McHugh, owner of F.X. McRory's restaurant, testified that his restaurant normally employed 98 persons, but that during the period the Kingdome was unable to accommodate the regularly scheduled home games of the Mariners due to the closure of that facility for repairs, the restaurant was forced to reduce its staff to 47 persons.
[3] King County is the only county in Washington with a population of one million or more. 1995 Washington State Yearbook 106 (1995).
[4] The Stadium Act authorized the county to: (1) increase its sales and use tax by as much as 0.015 percent; (2) impose taxes on the retail sale and use of food and beverages by restaurants, taverns, and bars; and (3) impose a special sales and use tax on retail car rentals. The county was also given authority to impose a tax on admission charges for events held in the stadium constructed as a result of the Stadium Act. The act authorized the State to generate funds for the baseball stadium through sales of "special baseball stadium license plate[s]" and lottery "scratch games with sports themes." Laws of 1995, 3rd Spec. Sess., ch. 1, งง 102(2), 104.
[5] Section 310 of the Stadium Act reads as follows:

"This act is necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and shall take effect immediately." Laws of 1995, 3rd Spec. Sess., ch. 1, ง 310 at 13.
[6] Ruano had earlier filed an action in Kittitas County Superior Court seeking a writ of mandamus to compel the Secretary of State to process their petition for referendum. On December 4, 1995, in response to the State's motion, the Kittitas County Superior Court dismissed the action, concluding that it lacked jurisdiction. On December 8, 1995, Ruano and Scannell moved to intervene in CLEAN v. State, but later withdrew the motion.
[7] The word "or" apparently was omitted inadvertently, so the phrase has been interpreted consistently as though it had not been omitted. Farris v. Munro, 99 Wash.2d 326, 335, 662 P.2d 821 (1983). This court has consistently held that there are two separate exceptions to the people's right of referendum. Farris, 99 Wash.2d at 336, 662 P.2d 821.
[8] No less authority than the Supreme Court of the United States has observed that the presence of a major league baseball team in a community bestows on that community certain intangible benefits. In quoting a lower court proceeding in the same case, the court noted:

"`Baseball has been the national pastime for over one hundred years and enjoys a unique place in our American heritage. Major league professional baseball is avidly followed by millions of fans, looked upon with fervor and pride and provides a special source of inspiration and competitive team spirit especially for the young.
"`Baseball's status in the life of the nation is so pervasive that it would not strain credulity to say the Court can take judicial notice that baseball is everybody's business.'" Flood v. Kuhn, 407 U.S. 258, 266, 92 S.Ct. 2099, 2104, 32 L.Ed.2d 728 (1972) (quoting Flood v. Kuhn, 309 F.Supp. 793, 797 (1970)).
[9] The testimony presented at the hearings of the committees of the House and Senate made it obvious that there is much more at stake than the interests of a few private entrepreneurs. Indeed, the interests of those entrepreneurs are not really threatened by a departure of the Mariners because a sale of the team would protect, if not enhance, their interests. Neither are the generally high salaries of the team members imperiled by a franchise move. The players' contracts would be honored by the owner of the franchise regardless of where the team plays its home games. Rather it is the ushers, program sellers, food and memorabilia vendors, and the owners and employees of Seattle area restaurants, retail stores and hotels who primarily benefit in an economic sense from the assured presence of a major league baseball team that plays its home games in a stadium in King County.
[10] At the hearing before the Senate Ways and Means Committee, Governor Lowry stated, "[I]t is clear that if we do not act, the Mariners ownership just simply cannot continue to lose $25 to 30 million dollars a year they have been losing ... and will have to, on October 30, put the team up for sale. We then will be facing all of this loss for our quality of life and economy of our state. That is why we do have a special session." Senate tape 1 (Oct. 12, 1995).
[11] John Torrance, a Seattle business man, testified at the Senate hearing that "[t]he market of Washington, Oregon, and British Columbia by the year 2000, will be bigger than that of all of New England ... I've been offered a lot more money to work on the retractibility of BC Place Stadium and a team for that city with the four million people of British Columbia than I have down here so that's a threat that we have if we don't act here. This is a huge market in the Northwest, it will not be without football or baseball." Senate tape 1 (Oct. 12, 1995).
[12] If we were, as the dissent would have us do in this case, to review de novo all acts of the Legislature where an emergency is declared to determine if there really was an emergency, we would do little else. At all three sessions of the Legislature in 1995, 135 acts contained the words "this act is necessary for the immediate preservation of the public peace, health or safety or the support of the state government and its existing public institutions, and shall take effect immediately."
[13] Although not discussed in any of the briefs, the opponents of this measure are not precluded from seeking repeal of the Stadium Act by initiative, the first power of the people. Wash. Const. art. II, ง 1(a) (amend. 72).
[1] Emergency clauses are common in legislation to set an earlier or later effective date for the legislation than the constitution routinely provides. Of the hundreds of bills enacted into law during 1995, 135 contained emergency clauses. Governor Lowry vetoed 6 emergency clauses from bills during that same time period.

Legislators recognize emergency clauses in bills forestall the right of referendum; they are not hesitant to argue in committee or floor debate that an emergency is not present and such a clause should be deleted. See, e.g., Laws of 1996, ch. 178. In its original form, House Bill 1627 contained an emergency clause in section 25. The Senate Health & Long Term Care Committee deleted the emergency clause and provided an effective date. 1996 House Journal at ___.
[2] "The constitutional principle upon which [the enrolled bill doctrine] is based is that the three branches of state government are co-equal in dignity and that none of them is entitled to look behind the properly certified record of another to determine whether that branch has followed the procedures prescribed by the constitution, but rather each is responsible and answerable only to the people for its proper performance of the function for which it is instituted." Citizens Council v. Bjork, 84 Wash.2d 891, 897-98 n. 1, 529 P.2d 1072 (1975). The dissent would abandon this Court's 100-year history of judicial restraint expressed in the enrolled bill doctrine.
[3] The dissent also argues the Legislature's emergency clause was improper because a stadium for major league baseball was not a matter involving the public peace, health, or safety of the state. Dissent at 1075, 1077-79. I fully concur in the majority's rejection of such a restrictive conception of state government.
[4] The dissent offers no specific Washington authority requiring legislative findings of fact regarding an emergency. The only Washington authorities specifically requiring findings are readily distinguishable. City of Federal Way v. King County, 62 Wash.App. 530, 815 P.2d 790 (1991) (based on Federal Way Charter which required City Council to enter findings of fact regarding an emergency for emergency ordinance to be effective); City of Spokane v. Harris, 25 Wash.App. 345, 606 P.2d 291 (1980) (similar Spokane City Charter provision).

We have never presumed to require legislative findings of fact of emergency in any published opinion to satisfy article II, section 1 of our constitution.
[5] Since the people adopted the 68th Amendment in 1979 providing for annual regular legislative sessions and new procedures for calling special legislative sessions. Wash. Const., art. II, ง 12, only 2 other special sessions were called which confined their agenda to a single issue. Laws of 1983, 3rd Ex.Sess., ch. 1 (special primary election to fill vacancy in U.S. Senate seat created by death of Senator Henry Jacksonโlegislation contained emergency clause); Laws of 1986, 1st Ex.Sess., ch. 1 (implementation of federal policy permitting people of state to reject a federal siting of a high-level nuclear waste facilityโbill contained referendum clause at Governor's request).
[6] The court may appropriately consider sequential drafts of a bill in determining legislative intent. Spokane County Health Dist. v. Brockett, 120 Wash.2d 140, 153, 839 P.2d 324 (1992).
[7] The absence of an amendment may be indicative of legislative intent. See State v. Clark, 129 Wash.2d 805, 812-13, 920 P.2d 187 (1996) (rejection of an amendment to existing statute may indicate legislative intent underlying the statute); Carnation Co., Inc. v. Hill, 115 Wash.2d 184, 189, 796 P.2d 416 (1990) (effect of failure of Legislature to amend statutory language in face of long-standing interpretation of statute by court).
[1] M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579(1819).
[2] I note that article II, section 1, was amended by amendment 72 in 1981. However, amendment 72 addressed time periods for filing of initiatives and is irrelevant to the issue before us today. It was amendment 7 which created the referendum power in 1912.
[3] Laws of 1995, 3d Spec. Sess., ch. 1.
[4] This is the classic rule of all constitutional interpretation:

Constitutions are not designed for metaphysical or logical subdeties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss.
See Joseph Story, Commentaries on the Constitution of the United States ง 451 (Thomas Cooley ed., 5th ed. 1891).
[5] Abo see State v. Rivers, 129 Wash.2d 697, 720, 921 P.2d 495 (1996) (Sanders, J., dissenting) ("Our Constitution arose from a profound distrust of the Legislature and in large part was designed to stricdy limit the Legislature.") (citing Lebbeus J. Knapp, The Origin of the Constitution of the State of Washington, 4 Wash. Historical Q. 227, 251 (Oct. 1913)).
[6] Frederic C. Howe, The City: The Hope of Democracy 171-72 (Univ. of Wash. Press 1967) (1905).
[7] The Federalist No. 78 at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961):

No legislative act therefore contrary to the constitution can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid. If it be said that the legislative body are themselves the constitutional judges of their own powers and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution.... It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature .... to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is in fact, and must be, regarded by the judges as a fundamental law. It therefore belongs to them to ascertain its meaning as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought of course to be preferred; or in other words, the constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.
Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature declared in its statutes, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental.
[8] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-80, 2 L.Ed. 60 (1803) (C.J. Marshall):

"The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing; if these limits may, at any time, be passed by those intended to be restrained?.... It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.
Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it.
... [A]n act of the legislature repugnant to the constitution is void.
... If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law? This would be to overthrow in fact what was established in theory; and would seem, at first view, an absurdity too gross to be insisted on.
... (at 180) Why does a judge swear to discharge his duties agreeably to the constitution of the United States, if that constitution forms no rule for his government? if it is closed upon him and cannot be inspected by him.
If such be the real state of things, this is worse than solemn mockery. To prescribe, or to take this oath, becomes equally a crime...."
Thus, the particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitution is void, and that courts, as well as other departments, are bound by that instrument.
[9] See also State ex rel. Mcleod v. Reeves, 22 Wash.2d 672, 674, 157 P.2d 718 (1945) ([w]hether an emergency exists is "in the ultimate, a judicial question."); see also Professor Philip A. Trautman, Initiative and Referendum in Washington, 49 Wash. L.Rev. 55, 73 n. 68 (1973) ("[W]hether or not laws passed by the state legislature are `emergent' as exceptions to the referendum provisions of the state constitution is a judicial question.").
[10] See also State ex rel. Gray v. Martin, 29 Wash.2d 799, 806, 189 P.2d 637 (1948) ("[A]n emergency does not mean expediency, convenience, or best interest ....") (citing State ex rel. Reiter v. Hinkle, 161 Wash. 652, 656, 297 P. 1071 (1931)).
[11] See also State ex rel. Reiter v. Hinkle, 161 Wash. 652, 657, 297 P. 1071 (1931) (An emergency is limited to "[f]irst, police power acts, whose purpose is the immediate preservation of the public peace, health or safety; [or] second, those which have for their object the support of the state government....").
[12] Apparently the alleged motivation behind the Stadium Act is the belief by some that the Mariners baseball team will leave Seattle unless it is furnished a new stadium, because, it is asserted, that more fans would attend the new facility than the existing Kingdome facility. However, as Yogi Berra said, "If people don't want to come out to the ballpark, nobody's going to stop them."
[13] Cf. Dale F. Rubin, Public Subsidies to Private Corporations and the Washington Constitution, Washington Institute for Policy Studies (1996).
[14] This is one of the leading and most recent opinions on the matter which is extremely articulate and persuasive.
[15] The majority's concurrence claims that "the burden of proving an emergency clause invalid rests squarely on the party challenging the clause. Hoppe [v. State, 78 Wash.2d 164, 170, 469 P.2d 909 (1970)]." Concurrence at 1071. However Hoppe says nothing of the kind and relates to a completely different constitutional provision in the context of completely unrelated subject matter.
[16] "Judicial notice" is limited to "easily accessible sources of indisputable accuracy and verifiable certainty," such as encyclopedias, etc. State ex rel. Humiston, 61 Wash.2d at 779, 380 P.2d 735. See also Black's Law Dictionary 848 (6th ed.1990) (judicial notice is limited to facts which, "from their nature, are not properly the subject of testimony, or which are universally regarded as established by common notoriety...."); 5 Karl Teglund, Washington Practice 102 (3d ed.1989) ("[a] judicially noticed fact must be one not subject to reasonable dispute...."); Ferree v. Fleetham, 7 Wash.App. 767, 771, 502 P.2d 490 (1972) (before a court can take judicial notice of alleged "facts," those facts must be "`known'โ that is, well established and authoritatively settled, without qualification or contention ....' and `if there is any doubt whatever either as to the fact itself or as to its being a matter of common knowledge,'" then judicial notice is improper (citation omitted); Snow's Mobile Homes, Inc. v. Morgan, 80 Wash.2d 283, 291, 494 P.2d 216 (1972) ("[s]tatements and opinions of individual legislators generally are not considered by the courts in construing legislation ...." [however, the reason for offering the matters here asserted is not to "construe" legislation, but rather to constitutionally justify legislation which is unambiguous on its face]). Facts regarding the status or intention of the Mariners are not judicially noticeable, nor is legislative debate, nor is what small children told the Governor, and nor is what some people testified at legislative hearings. Compare Majority at 1057-58.

I also disagree with the concurrence that "fact finding is left to the Legislature," (citing Hamilton v. Martin, 173 Wash. 249, 258, 23 P.2d 1 (1933)). Concurrence at 1071. This is true only in the sense that the Legislature may set forth specific factual findings on the face of legislation. However that is inapplicable to the case at bar since the Stadium Act has no factual findings whatsoever on its face. There may be other "facts," or alleged facts, which are discussed during the legislative process; however, those facts are not "found" by the Legislature. Facts not set forth on the face of the legislation, unless capable of judicial notice, are relevant to a judicial proceeding only insofar as they are found by the traditional judicial method.
[17] Black's Law Dictionary defines "boilerplate" as "[l]anguage which is used commonly in documents having a definite meaning in the same context without variation; used to describe standard language in a legal document that is identical in instruments of a like nature." Black's Law Dictionary 175 (6th ed.1990). This clause is "boilerplate" because it is a word for word recitation of the constitutional provision inserted in numerous different enactments (almost 1,000) without reference to the subject or purpose thereof, nor to the specific applicability to the enactment. Here, for example, the emergency clause also references "support of the state government and its existing public institutions ..." but even the majority rejects this phrase: "[I]t cannot seriously be contended.that the Stadium Act is in support of an existing state institution." Majority at 1064. The addition of such boilerplate seems to signify no more than the legislative intention that the enactment become effective immediately and/or avoid the prospect of referendum, but it does not tell us why the Legislature believes the emergency exists, or if it does.
[18] The concurrence finds significance in that the Stadium Act was passed in a special session called for that purpose. Concurrence at 1072. However, it cites no authority giving this "fact" any significance whatsoever regarding the subject at hand. We have had many special sessions but that is no indication that bills passed at them have emergency clauses much less comply with constitutional criteria if they do.
[19] Compare Glen Seredynski et al., Perspective On Team Relocation, League Expansion, and Public Policy or, Where Do We Put This Hockey Franchise and Why Would You Care? 4 Seton Hall J. Sport L. 663, 665 (1994) (Threat of relocation "generates fierce inter-city competitive bidding that leads to a wasteful expenditure of social resources by forcing the building of playing facilities, granting tax concessions, or guaranteeing season ticket sales.").

Pamela Edwards, Note, How Much Does that $8.00 Yankee Ticket Really Cost? An Analysis of Local Governments' Expenditure of Public Funds to Maintain, Improve or Acquire an Athletic Stadium For The Use of Professional Sports Teams, 18 Fordham Urb. L.J. 695, 698-99 (1991) ("In a recent study, one economist found no correlation between the presence of a sports stadium or arena and local long-term economic growth.") (citing Baade, Is There an Economic Rationale for Subsidizing Sports Stadiums, 13 Heartland Inst. Pol'y Study No. 2 at 12-18 (1987)).
Edwards, supra, 18 Fordham Urb. L.J. at 699 ("Comparing the construction costs of publicly owned stadiums with those of privately owned stadiums, a second economist concluded that privately owned facilities were built more economically and efficiently. Privately owned stadiums were also more efficiently operated than publicly owned stadiums. Examples of publicly owned stadium projects that have lost money include the New Orleans Superdome and the Pontiac Silverdome. Stadiums are expensive to construct and to operate; those that are not the home of a professional sports team may host major events infrequently, thereby making it difficult for the stadium to generate enough revenue to cover its maintenance costs. When a government-owned stadium cannot cover operating expenses from its revenues, the taxpayers must foot the bill. Several major stadiums have generated large losses in the past and continue to do so. These losses must be covered by the public treasury: the Oakland Coliseum lost $30 million between 1964 and 1984; the Metrodome in Minnesota lost $1.8 million every year during the early 1980s; the New Orleans Superdome incurred deficits of between $3 million and $5 million dollars per year for the first nine years of its existence. Taxpayers in California, Minnesota and Louisiana have had to cover the operating losses of local stadiums.").
Id., 18 Fordham Urb. L.J. at 700-01 ("several host cities have faced the loss of major league sports teams. In order to keep franchises in their cities, local officials have granted a number of taxpayer subsidies to team owners. These subsidies include below market rent, tax exemptions and tax rebates. The State of Louisiana agreed to remit to the team all revenue the Saints generate by playing in the Superdome. This action, combined with the state's abolition of an amusement tax on tickets, transfers $2.5 million per year from the state's taxpayers to the Saints. Philadelphia spent $30 million to construct skyboxes for the Eagles with the agreement that the Eagles would retain the revenue from the boxes. The City of Philadelphia provided the Phillies with $1 million dollars for a new scoreboard, allowed the team to construct special baseball suites, and assumed annual loan payments of $745,000 on behalf of the team.
The agreement also permitted the team to retain most of the revenue earned by the suites.").
[20] Perhaps they were at work trying to scrape enough money together to feed their family or pay their taxes, rather than attending legislative hearings. Perhaps they rely on this court to protect their legal rights.
[21] See footnote 14, supra.
[22] The concurrence to the majority claims the dissent is "insulting" (Concurrence at 1071), harsh, unfounded, without merit and "reflects a reckless willingness to throw off the fetters of judicial restraint and impose judicial policy preferences on the people of Washington" (Concurrence at 1072). To the contrary, it is the majority and the concurrence which refuse to enforce the people's right to express their preference through referendum.